**DSC COMMUNICATIONS CORPORATION, Plaintiff–Appellant,**

v.

**PULSE COMMUNICATIONS, INC., Defendant–Cross Appellant.**

Nos. 98–1024, 98–1031.

United States Court of Appeals, Federal Circuit.

March 11, 1999.

---

Ruffin B. Cordell, Fish & Richardson P.C., Washington, DC, argued for plaintiff-appellant. With him on the brief were John M. Skenyon, Francis X. Gindhart, Linda Liu Kordziel, and Michael J. McKeon. Of counsel on the brief were Thomas M. Melsheimer, P.C., Lynn Stodghill Melsheimer & Tillotson L.L.P., Dallas, Texas; and Jon A. Baumgarten, Proskauer Rose, L.L.P., Washington, DC.

David R. Francescani, Darby & Darby, P.C., New York, New York, argued for defendant-cross appellant. With him on the brief were Joseph B. Lerch, Eric A. Prager, Maryann V. Hayes, and Benjamin Levi. Of counsel on the brief were Jonathan T. Cain and Mary Catherine Zinser, Mays & Valentine, LLP, McLean, Virginia; and Professor Raymond T. Nimmer, University of Houston Law Center, Houston, Texas. Of counsel were William F. Dudine, Jr., Martin E. Goldstein, Kandis M. Kahn, and Daniel R. Schechter, of Darby & Darby, P.C.

Before MAYER, Chief Judge, FRIEDMAN, Senior Circuit Judge, and BRYSON, Circuit Judge.

BRYSON, Circuit Judge.

DSC Communications Corporation (DSC) and Pulse Communications, Inc., (Pulsecom) make products for the telephone industry and compete for the business of the Regional Bell Operating Companies, more commonly known as the "RBOCs." Competition between the two parties led to this litigation over certain products that the two produce for use in commercial telephone systems.

DSC struck first, filing an action in the United States District Court for the Eastern District of Virginia in which it alleged that Pulsecom had committed various federal and state law violations, including (1) contributory infringement of DSC's copyright in certain software used with one of DSC's products; (2) direct infringement of DSC's copyright in that software; (3) misappropriation of DSC's trade secrets; and (4) tortious interference with DSC's business expectancy. Pulsecom then counterclaimed, charging that DSC had infringed Pulsecom's U.S. Patent No. 5,263,-081 (the '081 patent).

The parties went to trial on DSC's claims, and at the close of DSC's case-in-chief, Pulsecom moved for judgment as a matter of law. The court granted the motion and dismissed all four of DSC's claims. With respect to Pulsecom's counterclaim of patent infringement, the court held a hearing to construe the claims, and the parties subsequently filed cross-motions for summary judgment. The court granted DSC's motion and entered a summary judgment of noninfringement.

I

This case involves certain components of digital loop carrier systems (DLCs), electronic devices that allow telephone companies to serve large numbers of subscribers efficiently. Before the advent of DLCs, telephone companies had to run copper wire from their central offices to the telephones of each of their subscribers. DLCs allow the individual copper lines to be run over much shorter distances, resulting in large savings for telephone companies. Typically, a DLC is

placed in a location central to a number of subscribers, and copper lines are run over the relatively short distances from the DLC to the subscribers.

The DLC acts as an analog-to-digital converter and as a signal modulator-demodulator. The electrical signals that travel over the copper lines between the DLC and the subscribers are voice-frequency analog signals, but the signals that travel between the DLC and the central telephone office are digital signals that travel over a high-bandwidth (*e.g.*, fiber optic) digital channel. The DLC converts the various analog signals it receives from individual subscribers to a digital format and modulates those digital signals into a high-bandwidth composite signal that is sent to the central office through the digital channel. The DLC performs the reverse process on signals traveling from the central office to individual subscribers.

The devices at the heart of the dispute in this case are the "Litespan 2000" DLC, which is manufactured by DSC, and the interface cards, which DSC and Pulsecom designed to work with the Litespan. The Litespan has a backplane connecting 500 interface card slots, through interface circuitry, to a microprocessor. The backplane is controlled by an application-specific integrated circuit that uses a particular signaling protocol. The purpose of the interface cards is to comport with the backplane protocol while providing a particular type of service to subscribers. For example, a single Litespan might have some interface cards providing POTS (plain old telephone service) service and other interface cards providing PBX (private branch exchange) service. The analog signals traveling between the subscribers and the two types of interface cards may be quite different, but the interface cards process the signals so that they are compatible with the Litespan's backplane protocol.

Litespans and individual interface cards each have their own microprocessors and interface circuitry, which require software to operate. Two software packages are at issue here. The first is the Litespan System software, which includes both the Litespan operating system software and various Litespan utility programs. The second is the POTS–DI (download image) software, which DSC developed to operate its POTS interface cards. Both the Litespan System software and the POTS–DI software normally reside in nonvolatile storage within Litespan systems. When a DSC POTS card is inserted into a Litespan and powered up, a copy of the POTS–DI software is downloaded into volatile memory on the POTS card. When the POTS card is powered down, its copy of the POTS–DI software ceases to exist. This design allows changes to be made to the POTS–DI software in a central location (*i.e.*, in the Litespan system) with no need to update software in the individual POTS cards.

DSC designed the Litespan to be used in the telephone networks of the RBOCs, and it transferred the Litespan technology to the RBOCs through a series of comprehensive agreements. The seven agreements at issue here—DSC-Ameritech, DSC–NYNEX, DSC–Bell Atlantic (1993–96 and 1996–99), DSC–U.S. West, DSC–Pacific Bell, and DSC–Bell-South—have generally similar provisions. The agreements all contain provisions that license, under a variety of restrictions, the Litespan System software and POTS–DI software to the RBOCs.

Pulsecom has developed a Litespan-compatible POTS card to compete with DSC's POTS card. Pulsecom decided not to develop the software necessary to operate its POTS card, but rather to design the card so that—like DSC's POTS card—it downloads the POTS–DI software from the host Litespan into its resident memory upon power-up. Pulsecom's design has the obvious advantage of allowing Pulsecom's POTS cards to remain compatible with the Litespan system if DSC modifies its Litespan System software and POTS–DI software.

## II

### A

 Although DSC's complaint alleged only copyright and state law claims, we have jurisdiction over this appeal under 28 U.S.C. § 1295(a)(1) because Pulsecom filed a counterclaim that raised a nonfrivolous claim of

patent infringement. *See generally In re Innotron Diagnostics,* 800 F.2d 1077, 1080, 231 USPQ 178, 180 (Fed.Cir.1986); *Schwarzkopf Dev. Corp. v. Ti–Coating, Inc.,* 800 F.2d 240, 244, 231 USPQ 47, 50 (Fed.Cir.1986). Section 1295(a)(1) gives this court exclusive jurisdiction over an appeal from a final judgment of a district court "if the jurisdiction of that court was based, in whole or in part, on [28 U.S.C. § 1338]." The congressional policy underlying section 1295(a)(1) was to ensure uniform resolution of patent law disputes. In light of that policy and the plain language of section 1295(a)(1), we have held that our appellate jurisdiction extends to cases in which nonfrivolous claims of patent infringement have been raised in compulsory counterclaims. *See Aerojet–General Corp. v. Machine Tool Works,* 895 F.2d 736, 739–45, 13 USPQ2d 1670, 1672–78 (Fed.Cir.1990) (in banc). While the court in *Aerojet–General* did not need to decide whether to apply that principle to permissive counterclaims, we see no sufficient basis in the language or purpose of section 1295(a)(1) to distinguish between compulsory and permissive counterclaims. *See Unique Concepts, Inc. v. Manuel,* 930 F.2d 573, 575, 18 USPQ2d 1654, 1656 (7th Cir.1991); John Donofrio & Edward C. Donovan, *Christianson v. Colt Industries Operating Corp.: The Application of Federal Question Precedent to Federal Circuit Jurisdiction Decisions,* 45 Am. U.L.Rev. 1835, 1874–75 (1996). We therefore hold that any counterclaim raising a nonfrivolous claim of patent infringement is sufficient to support this court's appellate jurisdiction.

■ DSC's principal contention on appeal is that the district court improperly granted judgment to Pulsecom on DSC's contributory copyright infringement claim at the close of DSC's case. On that issue, as on the other copyright and state law issues before us, we follow the law of the circuit from which this appeal is taken. *See Glaxo, Inc. v. Novopharm, Ltd.,* 110 F.3d 1562, 1572, 42 USPQ2d 1257, 1265 (Fed.Cir.1997); *Atari, Inc. v. JS & A Group, Inc.,* 747 F.2d 1422, 1439–40, 223 USPQ 1074, 1087 (Fed.Cir.1984) (in banc). With respect to the issues raised in DSC's appeal, our task is therefore to determine how the Fourth Circuit would decide those issues.

■ DSC's theory of contributory infringement is that each time an RBOC powers up a Pulsecom POTS card in one of its Litespan systems, it directly infringes DSC's POTS–DI software copyright by copying the POTS–DI software from the Litespan into the resident memory of a Pulsecom POTS card. An act of direct infringement is a necessary predicate for any derivative liability on the part of Pulsecom; absent direct infringement, there can be no contributory infringement. *See, e.g., Subafilms Ltd. v. MGM–Pathe Communications Co.,* 24 F.3d 1088, 1092, 30 USPQ2d 1746, 1749 (9th Cir. 1994). The district court disposed of DSC's claim on the ground that DSC had not made a prima facie showing of direct infringement.

Pivotal to the proper resolution of DSC's copyright infringement claim is the interpretation and application of section 117 of the Copyright Act, 17 U.S.C. § 117. Because the Fourth Circuit has not had occasion to construe section 117, we have no direct guidance as to how that court would approach the problem in this case. We therefore look to general principles of copyright law in addressing the copyright infringement issue.

Section 117 provides a limitation on the exclusive rights of the owner of the copyright in a piece of software. It provides, in pertinent part:

> [I]t is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided: (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner....

17 U.S.C. § 117.

The district court concluded that making copies of the POTS–DI software (in the resident memory of POTS cards) was an "essential step in the utilization" of the POTS–DI software and that there was no evidence that the RBOCs used the software in any other manner that would constitute infringement. Accordingly, under the district court's theory of the case there was no direct infringement

(and thus no contributory infringement) if the RBOCs were section 117 "owners" of copies of the POTS–DI software.

The district court then held that the RBOCs were "owners" of copies of the POTS–DI software because they obtained the software by making a single payment and obtaining a right to possession of the software for an unlimited period. Those attributes of the transaction, the court concluded, made the transaction a "sale."

DSC challenges the district court's conclusion that, based on the terms of the purchase transactions between DSC and the RBOCs, the RBOCs were "owners" of copies of the POTS–DI software. In order to resolve that issue, we must determine what attributes are necessary to constitute ownership of copies of software in this context.

Unfortunately, ownership is an imprecise concept, and the Copyright Act does not define the term. Nor is there much useful guidance to be obtained from either the legislative history of the statute or the cases that have construed it. The National Commission on New Technological Uses of Copyrighted Works ("CONTU") was created by Congress to recommend changes in the Copyright Act to accommodate advances in computer technology. In its final report, CONTU proposed a version of section 117 that is identical to the one that was ultimately enacted, except for a single change. The proposed CONTU version provided that "it is not an infringement for the *rightful possessor of a copy* of a computer program to make or authorize the *making of another copy* or adaptation of that program . . . ." *Final Report of the National Commission on New Technological Uses of Copyrighted Works,* U.S. Dept. of Commerce, PB–282141, at 30 (July 31, 1978) (emphasis added). Congress, however, substituted the words "owner of a copy" in place of the words "rightful possessor of a copy." *See* Pub.L. No. 96–517, 96th Cong., 2d Sess. (1980). The legislative history does not explain the reason for the change, *see* H.R.Rep. No. 96–1307, 96th Cong., 2d Sess., pt. 1, at 23 (1980), but it is clear from the fact of the substitution of the term "owner" for "rightful possessor" that Congress must have meant to require more

than "rightful possession" to trigger the section 117 defense.

■ In the leading case on section 117 ownership, the Ninth Circuit considered an agreement in which MAI, the owner of a software copyright, transferred copies of the copyrighted software to Peak under an agreement that imposed severe restrictions on Peak's rights with respect to those copies. *See MAI Sys. Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 26 USPQ2d 1458, 1462 (9th Cir.1995). The court held that Peak was not an "owner" of the copies of the software for purposes of section 117 and thus did not enjoy the right to copy conferred on owners by that statute. The Ninth Circuit stated that it reached the conclusion that Peak was not an owner because Peak had licensed the software from MAI. *See id.* at 518 n. 5. That explanation of the court's decision has been criticized for failing to recognize the distinction between ownership of a copyright, which can be licensed, and ownership of copies of the copyrighted software. *See, e.g.,* 2 Melville B. Nimmer, *Nimmer on Copyright* ¶ 8.08[B][1], at 8–119 to 1–121 (3d ed.1997). Plainly, a party who purchases copies of software from the copyright owner can hold a license under a copyright while still being an "owner" of a copy of the copyrighted software for purposes of section 117. We therefore do not adopt the Ninth Circuit's characterization of all licensees as non-owners. Nonetheless, the *MAI* case is instructive, because the agreement between MAI and Peak, like the agreements at issue in this case, imposed more severe restrictions on Peak's rights with respect to the software than would be imposed on a party who owned copies of software subject only to the rights of the copyright holder under the Copyright Act. And for that reason, it was proper to hold that Peak was not an "owner" of copies of the copyrighted software for purposes of section 117. *See also Advanced Computer Servs. of Mich. v. MAI Sys. Corp.,* 845 F.Supp. 356, 367, 30 USPQ2d 1443, 1452 (E.D.Va.1994) ("MAI customers are not 'owners' of the copyrighted software; they possess only the limited rights set forth in their licensing agreements"). We therefore turn to the agreements between DSC and the

RBOCs to determine whether those agreements establish that the RBOCs are section 117 "owners" of copies of the copyrighted POTS–DI software.

Each of the DSC–RBOC agreements contains a provision that is similar in effect to the following, taken from the DSC–BellSouth agreement: "All rights, title and interest in the Software are and shall remain with seller, subject, however, to a license to Buyer to use the Software solely in conjunction with the Material [*i.e.*, the Litespan–2000 and related equipment] during the useful life of the Material." Two of the agreements also contain clauses that provide for the passage of title to all the material transferred from DSC to the RBOCs, except for the software. The language and the context of those clauses makes it clear that the clauses refer to DSC's rights to the copies of the software in the RBOCs' possession, not DSC's copyright interest in the software. There was no need for a contract clause making clear that DSC was not selling its copyrights in its software to its customers, as it was obvious that DSC did not intend to convey any ownership rights in its copyright as part of the licensing agreements with the RBOCs. The question of ownership of the copies of the software, by contrast, was a matter that needed to be addressed in the contracts.

Not only do the agreements characterize the RBOCs as non-owners of copies of the software, but the restrictions imposed on the RBOCs' rights with respect to the software are consistent with that characterization. In particular, the licensing agreements severely limit the rights of the RBOCs with respect to the POTS–DI software in ways that are inconsistent with the rights normally enjoyed by owners of copies of software.

Section 106 of the Copyright Act, 17 U.S.C. § 106, reserves for a copyright owner the following exclusive rights in the copyrighted work: the right to reproduce the work; the right to prepare derivative works; the right to distribute copies of the work; the right to perform the work publicly; and the right to display the work publicly. Those rights are expressly limited, however, by sections 107 through 120 of the Act. Of particular importance are the limitations of sections 109 and 117. As we have seen, section 117 limits the copyright owner's exclusive rights by allowing an owner of a copy of a computer program to reproduce or adapt the program if reproduction or adaptation is necessary for the program to be used in conjunction with a machine. Section 109, which embodies the "first sale" doctrine, limits the copyright owner's otherwise exclusive right of distribution by providing, in relevant part, that

> the owner of a particular copy ... is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy....

. . . . .

> Notwithstanding [the above], unless authorized by ... the owner of copyright in a computer program ... [no] person in possession of a particular copy of a computer program ... may, for the purposes of direct or indirect commercial advantage, dispose of, or authorize the disposal of, the possession of that ... computer program ... by rental, lease, or lending....

17 U.S.C. § 109.

Each of the DSC–RBOC agreements limits the contracting RBOC's right to transfer copies of the POTS–DI software or to disclose the details of the software to third parties. For example, the DSC–Ameritech agreement provides that Ameritech shall "not provide, disclose or make the Software or any portions or aspects thereof available to any person except its employees on a 'need to know' basis without the prior written consent of [DSC]...." Such a restriction is plainly at odds with the section 109 right to transfer owned copies of software to third parties. The agreements also prohibit the RBOCs from using the software on hardware other than that provided by DSC. If the RBOCs were "owners of copies" of the software, section 117 would allow them to use the software on any hardware, regardless of origin. Because the DSC–RBOC agreements substantially limit the rights of the RBOCs compared to the rights they would enjoy as "owners of copies" of the POTS–DI software under the Copyright Act, the contents of the agreements support the charac-

terization of the RBOCs as non-owners of the copies of the POTS–DI software.

In finding that the RBOCs were owners of copies of the POTS–DI software, the district court relied heavily on its finding that the RBOCs obtained their interests in the copies of the software through a single payment and for an unlimited period of time. It is true that the transfer of rights to the POTS–DI software in each of the agreements did not take the form of a lease, and that the transfer in each case was in exchange for a single payment and was for a term that was either unlimited or nearly so. One commentator has argued that when a copy of a software program is transferred for a single payment and for an unlimited term, the transferee should be considered an "owner" of the copy of the software program regardless of other restrictions on his use of the software. *See* Raymond T. Nimmer, *The Law of Computer Technology* ¶ 1.24[1], at 1–143 to 1–144 (3d ed.1997). That view has not been accepted by other courts, however, and we think it overly simplistic. The concept of ownership of a copy entails a variety of rights and interests. The fact that the right of possession is perpetual, or that the possessor's rights were obtained through a single payment, is certainly relevant to whether the possessor is an owner, but those factors are not necessarily dispositive if the possessor's right to use the software is heavily encumbered by other restrictions that are inconsistent with the status of owner.

In passing, the district court found added support for its ruling on the contributory infringement issue in the "non-exclusive market rights" clause in DSC's contracts with the RBOCs. The court concluded that the market rights clause supported its view that the RBOCs were entitled to use the POTS–DI software in connection with Pulsecom's POTS cards, because otherwise there would be no point in permitting the RBOCs to buy equipment such as POTS cards from another source.

We conclude that the district court read the market rights clause too broadly. The market rights clause gave the RBOCs the right to obtain competing products and software from other sources, but it did not give the RBOCs the right to copy DSC's copyrighted software in the course of using other companies' products. In fact, the contracts specifically prohibited the RBOCs from copying DSC's software except for use with DSC equipment.

In light of the restrictions on the RBOCs' rights in the copies of the POTS–DI software, we hold that it was improper for the court to conclude, as a matter of law, that the RBOCs were "owners" under section 117 of the copies of DSC's software that were in their possession. The court was therefore incorrect to rule, at the close of DSC's case, that section 117 of the Copyright Act gave the RBOCs the right to copy the POTS–DI software when using Pulsecom's POTS cards without violating DSC's copyright in the software. Accordingly, we reverse the district court's order granting judgment for Pulsecom on DSC's contributory infringement claim.

B

DSC next challenges the district court's ruling—again at the close of DSC's case-in-chief—dismissing DSC's claim of direct copyright infringement.

In its amended complaint, DSC charged that Pulsecom committed direct copyright infringement by creating copies of the POTS–DI software, both in two Litespan systems that Pulsecom obtained on the open market, and in the RBOCs' own Litespan systems. The district court found no infringement on the ground that the RBOCs' rights under 17 U.S.C. § 117 allowed them to authorize the making of copies of the POTS–DI software and thus shielded Pulsecom from liability for making copies of the software on the RBOCs' Litespan systems. Our rejection of the district court's ruling that the RBOCs were entitled under section 117 to make such copies requires that we also reject the court's conclusion that Pulsecom was legally entitled to make copies of the POTS–DI software by using the RBOCs' Litespan systems. *See Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 789–92 (5th Cir.1999). Accordingly, that aspect of DSC's direct in-

fringement claim must be remanded to the district court for further proceedings.

■ With respect to Pulsecom's activities in creating copies of the POTS–DI software with its own Litespan systems, we reach a different conclusion. Pulsecom obtained its Litespan systems on the open market. It was thus an owner of those systems and the associated software, and it was not subject to any restriction on its ownership interest through a licensing agreement or otherwise. As such, it was entitled, under 17 U.S.C. § 117, to make such copies of the POTS–DI software as we're necessary to operate the systems. To the extent that DSC's direct infringement claim is directed at Pulsecom's conduct in making copies of the POTS–DI software during the operation of its own Litespan systems, DSC has no valid claim, and the district court's ruling is correct. Although DSC characterizes Pulsecom's activities in obtaining the Litespan systems as devious because Pulsecom did not purchase the systems in its own name, we attach no legal significance to the fact that Pulsecom used a third party to purchase the Litespan systems. Pulsecom's agent obtained the Litespan systems without restriction on their use, and there is no evidence that the copies were obtained through any misrepresentations that would affect the use that Pulsecom could lawfully make of the systems.

■ The district court dismissed DSC's direct copyright infringement claim on the ground that Pulsecom's conduct was excused by the affirmative defense of fair use for reverse engineering, as discussed in *Sega Enterprises, Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520, 24 USPQ2d 1561, 1569 (9th Cir. 1992). The *Sega* case, however, does not stand for the proposition that any form of copyright infringement is privileged as long as it is done as part of an effort to explore the operation of a product that uses the copyrighted software. On the basis of DSC's evidence at trial, Pulsecom's activities in creating copies of the POTS–DI software on its POTS cards by using the RBOCs' Litespan systems does not qualify as "fair use" under the *Sega* analysis. DSC's evidence showed that Pulsecom representatives made copies of the POTS–DI software on Pulsecom POTS cards as part of the ordinary operation of those cards, not as part of an effort to determine how the Litespan system worked. Rather than being part of an attempt at reverse engineering, the copying appears to have been done after Pulsecom had determined how the system functioned and merely to demonstrate the interchangeability of the Pulsecom POTS cards with those made and sold by DSC.

Of course, Pulsecom has not put in its evidence on direct infringement, since the court granted judgment for Pulsecom at the close of the DSC's case. It is possible that Pulsecom may be able to make out a case of fair use under the *Sega* case or that there was no prohibited copying of the DSC software by Pulsecom, but in light of the state of the evidence at the close of DSC's case-in-chief, it was error for the district court to take the direct infringement case away from the jury with respect to the claims relating to the copies Pulsecom allegedly made of the POTS–DI software.

Finally, DSC argues in a footnote that Pulsecom made multiple copies of the Litespan System software and that its apparent copying of that software constitutes direct copyright infringement. In its amended complaint, however, DSC appeared to limit its direct copyright claim to the copying of the POTS–DI software. On remand, the district court can determine whether DSC's claim extends to the copies Pulsecom allegedly made of the Litespan System software or is limited to the copies Pulsecom made of the POTS–DI software.

**C**

DSC next argues that the district court improperly directed judgment as a matter of law that Pulsecom is not liable for misappropriating DSC's trade secrets under Virginia trade secrets law. The court found that because Pulsecom purchased the Litespan systems on the open market and not by improper means, it did not misappropriate any of DSC's trade secrets through the purchase of the Litespan systems. The court also found that Pulsecom's use of a "snooper board" at the NYNEX testing facilities to

examine DSC's Litespan system did not lead to the misappropriation of DSC's trade secrets. On that issue, the court held that the only information gathered by Pulsecom's "snooper board" was information about the locations in the Pulsecom boot code that the Litespan system looked at to determine if a particular POTS card was a DSC card or not. The court further found that there was no evidence that the DSC lock-out software accessed by Pulsecom was a trade secret. As to the charge that Pulsecom obtained information regarding certain commands from Litespan manuals that a Pulsecom representative examined at the BellSouth laboratories, the court ruled that DSC had failed to show that the information in question constituted a trade secret.

The court also held that DSC's trade secret claims were preempted by the preemption provision of the Copyright Act, 17 U.S.C. § 301. To avoid preemption under that provision, the court explained, a state law cause of action must have "an extra element that changes the nature of the state law action so that it is qualitatively different from a copyright infringement claim," which the court held not to be true of the Virginia cause of action for misappropriation of trade secrets.

The Uniform Trade Secrets Act (UTSA), which has been adopted in Virginia, defines a trade secret as follows:

> [I]nformation, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Va.Code Ann. § 59.1–336. The statute defines "improper means" to include theft, bribery, misrepresentation, breach of a duty or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. *Id.*

■ Although the district court concluded that none of the information about the Litespan system that Pulsecom obtained at the BellSouth labs constituted a trade secret, there is at least a triable issue of fact as to whether the provisioning commands that Pulsecom obtained would qualify as trade secrets under the UTSA definition. DSC offered evidence that the Pulsecom cards would operate with the improved version of Litespan software only after Pulsecom's engineers obtained and applied the codes. Moreover, DSC's evidence showed that Pulsecom paid BellSouth a fee in order to be able to obtain the information, which was not ascertainable by proper means because it was licensed to BellSouth subject to a confidentiality agreement. While Pulsecom argues that the provisioning codes could not be trade secrets, since the Litespan system was available on the open market, DSC's evidence indicated that even though Pulsecom was able to purchase two Litespan systems, it was not able to obtain copies of the updated system software and accompanying documentation.

With respect to the information obtained through the use of the "snooper board" that was sent to NYNEX, there was also sufficient evidence to raise a triable issue of fact as to whether that information was a trade secret. The information—the method DSC used to exclude Pulsecom as a competitor—was apparently of economic value to DSC, and the information was apparently not available by proper means because it was licensed to NYNEX subject to a confidentiality agreement. The fact that the information related to locations in the Pulsecom boot code that the Litespan was looking for does not mean that the information was not a trade secret; the information was DSC's even though it related to a method of exclusion that relied on examination of a non-DSC product.

There was likewise a triable issue of fact on the question whether the information obtained as a result of Pulsecom's activities at BellSouth and NYNEX was obtained by misappropriation, as is required by the UTSA. Misappropriation requires the use of "improper means." A jury could find that Pulsecom obtained that information by inducing BellSouth and NYNEX to breach their confidentiality agreements with DSC. Accordingly, there was a triable issue of fact as

to whether Pulsecom misappropriated any of DSC's trade secrets within the meaning of the UTSA.

 Finally, we reject the district court's ruling that the trade secret claim was preempted by the federal Copyright Act. The Fourth Circuit has held that 17 U.S.C. § 301 requires a two-step preemption inquiry. The work must be "within the scope of the subject-matter of copyright," and "the rights granted under state law must be equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106." *United States ex rel. Berge v. Trustees of Univ. of Ala.*, 104 F.3d 1453, 1463, 41 USPQ2d 1481, 1488 (4th Cir.1997). The first part of the test is clearly satisfied in this case, as DSC's computer programs are within the subject matter of 17 U.S.C. § 102. The second part of the test, however, is not satisfied here. As the Fourth Circuit has held, a state law cause of action avoids preemption by the Copyright Act only when the state law cause of action "incorporate[s] elements beyond those necessary to prove copyright infringement, and ... regulate[s] conduct qualitatively different from the conduct governed by federal copyright law." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659, 27 USPQ2d 1014, 1017–18 (4th Cir.1993). Trade secret misappropriation under Virginia law requires "misappropriation" of information, either by a person who used improper means or by a person who knew or had reason to know that the information was derived through improper means or from or through a person who owed a duty not to reveal it, or by accident or mistake. Va.Code Ann. § 59.1–336. Copyright infringement, on the other hand, requires only that the plaintiff owns a valid copyright and that the defendant copied original elements of the copyrighted work. *Trandes*, 996 F.2d at 660, 27 USPQ2d at 1018. Moreover, the additional element of misappropriation regulates conduct qualitatively different from that regulated by federal copyright law. DSC's trade secret claim is therefore not preempted by 17 U.S.C. § 301. *Cf. Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d at 785–89 (action for misappropriation under Texas common law of unfair competition preempted because misappropriation does not require any element beyond those required for copyright infringement). Because DSC's trade secret claims are not preempted, and because DSC's evidence on the trade secret claims raised a triable issue of fact, we reverse the district court's order dismissing DSC's trade secret claims and remand that portion of the case to the district court for further proceedings.

### D

DSC next contends that the district court improperly ruled as a matter of law that Pulsecom is not liable for interfering with DSC's business expectancy.

 DSC claimed that it had "a specific business expectancy with Bell Atlantic for a commitment of $40 million of Litespan equipment and software." DSC had made an offer to sell equipment and software to Bell Atlantic for $40 million. The parties ultimately entered into a contract for the sale of the equipment and software for $27 million. The $27 million contract did not include the purchase of any of DSC's Litespan POTS cards, but Bell Atlantic ultimately purchased all of its requirement of Litespan POTS cards from DSC, although at a lower price than DSC initially offered. DSC's claim is for the $13 million differential between the contract it offered Bell Atlantic and the contract the parties ultimately executed.

 In order to establish the tort of intentional interference with business relations under Virginia law, a plaintiff must prove: (1) the existence of a particular business relationship or expectancy, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent the defendant's intentional misconduct, the plaintiff would have continued the relationship or realized the expectancy; and (4) damage to the plaintiff. *See Glass v. Glass*, 228 Va. 39, 321 S.E.2d 69, 77 (1984).

The expectancy in question must be reasonably certain to be realized. *See Levine v. McLeskey*, 881 F.Supp. 1030, 1057 (E.D.Va. 1995). The only evidence that DSC offered

with respect to the business expectancy element of its tort claim was (1) a Pulsecom interoffice memo stating that Pulsecom had learned of the $40 million DSC offer to Bell Atlantic, expressing concern about Bell Atlantic committing $40 million to DSC and effectively freezing Pulsecom out of its business for the period covered by the offer, and (2) testimony from a DSC employee that Bell Atlantic had rejected DSC's $40 million offer and had informed him that it was not interested in buying the POTS cards included in the proposal, which the employee thought strange since the POTS card is the card most used in the Litespan system.

That evidence, viewed in the light most favorable to DSC, falls short of establishing to a reasonable certainty that DSC would have made $13 million in sales of POTS cards to Bell Atlantic. Moreover, DSC failed to prove that Pulsecom's actions caused it to lose the $13 million that it claimed to have lost. DSC's evidence simply failed to raise a question on which a reasonable jury could find either that Bell Atlantic would have accepted the $40 million offer but for Pulsecom's interference, or that Pulsecom's interference caused the reduction in the price that Bell Atlantic ultimately paid for the DSC POTS cards. The district court was therefore correct in dismissing DSC's claim for intentional interference with business relations.

### III

#### A

In its cross-appeal, Pulsecom focuses principally on the district court's grant of summary judgment to DSC on the issue of patent infringement.

Pulsecom owns U.S. Patent No. 5,263,081 (the '081 patent), which relates to a method and apparatus for transmitting voice frequency signals to telephones in the "on hook" condition in a "ground start" telephone system. "Ground start" and "loop start" are two DC signaling modes used in POTS-type telephone systems to request service (e.g., to request a dial tone). Most ordinary analog telephones are connected to loop start systems; ground start is generally reserved for more complex applications, such as PBX or WATS systems. "On hook" voice-frequency transmission permits services such as caller identification, in which voice frequency information identifying the calling numbers can be transmitted to a telephone and displayed before the telephone is taken off the hook.

In the district court, Pulsecom argued that DSC's Remote Universal Voice Grade (RUVG) card, which is one of the plug-in channel cards used in the Litespan system, infringes claims 2, 5, and 7 of the '081 patent because it is capable of providing on-hook transmission in ground start mode PBX systems. Ruling on summary judgment motions, the district court held that DSC's RUVG cards do not infringe any of the asserted claims of the '081 patent. The court's judgment was based on its construction of claims 2 and 5. The pertinent portion of claim 2, which does not vary materially from the pertinent portion of claim 5, is set forth below:

> An apparatus for providing a voice frequency (VF) path for on-hook VF transmission through each of a plurality of channel units, each including a subscriber line interface circuit chip (SLIC), to a subscriber telephone instrument in a digital loop carrier system for providing POTS-type telephone service using DC signaling to the subscriber telephone instrument comprising the combination of. . . .

In construing the claim language, the court first ruled that the term "subscriber telephone instrument" refers to a typical analog telephone normally found in POTS service applications. Second, the court concluded that "POTS-type telephone service" is limited to service to normal analog telephones and does not include service to a PBX system. Because DSC's RUVG card is used only with PBX systems, the court determined that there was no infringement.

 The term "telephone instrument" is not given a special definition in the patent, and nothing in the specification or prosecution history of the '081 patent suggests that the patentee meant to depart from the ordinary meaning of the term. As the district court properly held, a "telephone instru-

ment" is commonly understood to be a device with a hook switch, a speaker, a microphone, and a keypad (or dial) for dialing numbers. We construe the term, as used in the '081 patent, consistently with that common understanding.

■ Pulsecom argues that the term "telephone instrument" includes PBX equipment, because the patent specification draws a distinction between conventional analog telephones, which operate using LS signaling, and generic "telephone instruments," which can operate using either LS or GS signaling. The portion of the specification on which Pulsecom relies reads as follows:

> Two DC supervisory signaling methods are employed in order to allow the subscriber equipment to request service on POTS-type telephone lines. . . . The DC supervisory signaling methods are Loop Start (LS) and Ground Start (GS).
>
> . . . . .
>
> In Ground Start, the subscriber signals the [central office] of a line request by grounding one leg of the telephone line and subsequently closing the loop with a DC termination. GS signaling is usually used with, but is not limited to, private branch exchanges (PBX), wide area telephone service (WATS) lines, and WATS trunks operating into a local [central office].

While this portion of the specification distinguishes between equipment using LS and GS signaling, it does not provide support for Pulsecom's argument that the term "telephone instrument" is broad enough to include all equipment included within a PBX system, such as the PBX interface between RUVG cards and the individual telephones in the PBX system.

The key to the proper construction of the claim language "for providing POTS-type telephone service using DC signaling to the subscriber telephone instrument" is the requirement that the subscriber telephone instrument use DC signaling to request service. Accordingly, we construe the claim language to include only those systems in which the telephone instrument requests telephone service using DC signaling.

Given the proper construction of "telephone service using DC signaling to the subscriber telephone instrument," the district court's grant of summary judgment of noninfringement cannot stand on the record before us, because the record presents an unresolved factual question. A PBX system allows a large number of telephone users to share a limited number of telephone lines. A typical PBX system comprises PBX equipment that is connected on one side to one or more DLC interface cards (such as DSC's RUVG card) and on the other side to a number of PBX telephones. When a call is placed from a PBX telephone, the PBX equipment (*i.e.*, the interface between PBX telephones and the RUVG cards) routes it either to another of the connected PBX telephones (in the case of an internal call) or to an external line (in the case of a call to an outside number). The unresolved factual question is whether, in the case of an external call, it is the PBX equipment, the calling PBX telephone, or some other device that requests service using DC signaling.

If the PBX equipment requests service using DC signaling, there is no "telephone service using DC signaling to the subscriber telephone instrument," as provided in claims 2 and 5 of the '081 patent, because in that case the service using DC signaling would extend only to the PBX equipment, which does not constitute a "telephone instrument." If, on the other hand, the PBX telephones request service using DC signaling, the device in question would be within the scope of the disputed claim language, because telephone service using DC signaling would extend to the telephone instruments themselves.

Because there is a genuine issue of fact material to the question of infringement, we vacate the district court's summary judgment and remand the case for proceedings consistent with our claim construction. Since the court based its non-infringement ruling on the language of claims 2 and 5 quoted above, the court found it unnecessary to determine whether there are other aspects of those claims that would defeat Pulsecom's claim of infringement. The district court therefore

may find it necessary to consider that issue on remand.

■ DSC invites us to sustain the district court's judgment on other grounds, but we decline to do so. First, DSC points out that there is no evidence that it has ever made, used, sold, or offered to sell any type of "telephone instrument." Consequently, it argues it cannot be held liable for direct infringement, because claims 2 and 5 recite a "telephone instrument." Claims 2 and 5, however, do not require that the claimed apparatus actually include a "telephone instrument"; the pertinent language simply requires the apparatus to provide POTS-type service that uses DC signaling to a telephone instrument.

■ Second, DSC argues that its RUVG cards do not contain the limitation inherent in the following means-plus-function clause that appears in both claims 2 and 5:

> means in each said control unit for generating control signals for said associated channel unit for establishing through a portion of the channel unit a communication path in response to receipt by said control unit means of an "idle" code in ground start mode during idle condition.

To establish infringement of a claim containing a means-plus-function clause, the patentee must prove that the accused device performs the recited function and that it does so through a structure that is disclosed in the specification or through a structure that is equivalent to the disclosed structure. *See, e.g., Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1388, 21 USPQ2d 1383, 1387 (Fed.Cir.1992). In this case, there is a question of fact as to whether DSC's RUVG card performs the function recited by the limitation. On the record before the district court, that question was not suitable for disposition by way of summary judgment.

One final comment on the district court's judgment is appropriate. The district court apparently based its ruling solely upon its construction of claims 2 and 5, because it did not expressly construe the language of claim 7. Pulsecom has not appealed that aspect of the judgment against it, and any grounds for objection in this regard are deemed waived.

B

■ Pulsecom's second contention in its cross-appeal is that DSC committed copyright misuse by attempting to use its copyright claims to prevent competition in the POTS card market. Copyright misuse is a defense to a claim of copyright infringement. *See Lasercomb Am., Inc. v. Reynolds,* 911 F.2d 970, 976–77, 15 USPQ2d 1846, 1851–52 (4th Cir.1990); *Alcatel USA, Inc. v. DGI Techs., Inc.,* 166 F.3d at 792–93. The district court denied Pulsecom's motion for summary judgment on the issue of copyright misuse, postponing the resolution of that issue until trial. At trial, the court dismissed DSC's copyright claims at the close of DSC's case and thus had no occasion to address Pulsecom's copyright misuse defense. The copyright misuse defense is therefore not ripe for appellate review, and for that reason we decline Pulsecom's invitation to discuss the merits of that defense at this point in the litigation.

Each party shall bear its own costs for this appeal.

*AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, and REMANDED.*