**APPLIED INFORMATION MANAGEMENT, INC.,**
Plaintiff,

v.

**Daniel P. ICART and Brownstone Agency, Inc., Defendants.**

**No. 94–CV–5846 (ARR) (SMG).**

United States District Court,
E.D. New York.

March 3, 1997.

---

John M. Brickman, Ackerman, Levine & Cullen, Great Neck, NY, for Plaintiff.

Paul W. Thorpe, Jr., Rebore, Thorpe & Pisarello, Lindenhurst, NY, for Defendants.

## AMENDED OPINION AND ORDER

ROSS, District Judge.

Plaintiff, Applied Information Management, Inc. ("AIM"), has brought this action against defendants Daniel P. Icart and Brownstone Agency, Inc. ("Brownstone") alleging copyright infringement, unfair competition, misappropriation of trade secrets, and breach of contract claims against both defendants in connection with Icart's modifications of certain computer software that AIM had provided to Brownstone. Defendant Brownstone has moved for summary judgment pursuant to Fed.R.Civ.P. 56 on all of AIM's claims. For the reasons described below, Brownstone's motion is granted in part and denied in part.

In resolving the summary judgment motion on the copyright issue, the court has considered the central question of whether the agreement between AIM, a designer of custom computer systems, and Brownstone, a user of that software, confers on Brownstone entitlement to the rights granted by Section 117 of the Copyright Act, 17 U.S.C. § 117. That section allows the "owner of a copy of a computer program" to make copies of and adaptations to the program without infringing the copyright in the program. Resolution of the issue is complicated by the fact that an agreement of this nature may convey rights and interests in two, rather than only one, form of property: the develop-

er may transfer copyright rights in the software program (intellectual property rights) and at the same time transfer rights in the copy of the program through the material object that embodies the copyrighted work (personal property rights). Because the technological developments that are the subject of such licensing agreements are relatively recent, the absence of clear legislative direction further complicates resolution of the issue. Furthermore, courts that have considered the question have not directly addressed the distinction between the two different forms of property rights involved.

### FACTUAL BACKGROUND

In June 1987, Brownstone, an insurance broker specializing in coverage for smaller multiple dwelling buildings, and AIM, a designer of custom computer systems, entered into a Systems Purchase Agreement ("the Agreement"). Both Brownstone and AIM concur that the Agreement provided for Brownstone to purchase specified computer hardware from AIM. Brownstone contends that the Agreement also constituted a purchase of the software specified in the Agreement. AIM contends that it merely licensed the software to Brownstone. The Agreement itself provides that it constitutes an agreement:

> for the purchase of the integrated information management system described below (the "System"). We agree as follows:
>
> 1. SYSTEM HARDWARE AND SOFTWARE
>
>    (a) You hereby purchase from AIM and AIM hereby sells to you the following computer hardware (the "Hardware"):
>
>    [list of hardware]
>
>    (b) AIM hereby grants to you and you hereby accept from AIM a license to use the following software developed by AIM or licensed to AIM (the "Application Software"):
>
>    **AIM Plus**
>
>    —Accounts Receivable/Sales Analysis/Invoicing
>
>    —Accounts Payable/Check Writing
>
>    —General Ledger

Custom Insurance Agency software as spec. in Schedule 2.

> The license being granted to you with respect to the Application Software is perpetual, non-exclusive and non-transferable, (except in connection with and as a part of a sale or other transfer by you of the System). As part of the license, you will receive object and source code versions of the Application Software.
>
> (c) AIM hereby transfers to you and you hereby accept from AIM a license to use the following software (the "Third Party Software"):
>
> [list of software]
>
> The license being transferred to you with respect to the Third Party Software is governed by the terms and conditions of the license agreement between you and the publishers of the Third Party Software. This license agreement is described on the package in which Third Party Software is sold or in a separate document provided by the Third Party Software publisher.
>
> 2. The total purchase price for the System is $124,209 consisting of $74,294 for the Hardware, $33,080 for the Software and $16,835 for Other Costs.... You will pay the purchase price in installments as follows:
>
>    (a) 20% of the total purchase price 24,-842 upon signing this letter;
>
>    (b) 30% of the total cost of the Software $9,924 upon acceptance of the System and Software Specifications;
>
>    (c) 80% of the total cost of the Hardware $59,435 upon installation of the Hardware;
>
>    (d) 40% of the total cost of the Software $13,232 upon installation of the Software;
>
>    (e) Balance of the total purchase price $16,776 (plus $10,247 for New York City Sales Tax) upon completion of training and demonstration that System is operational.

Since 1987, Brownstone has utilized the hardware and software in its insurance brokerage business. From 1987 to February

1995, AIM provided support services, including modification of the software, to Brownstone. In February 1995, Brownstone terminated the support services relationship with AIM. Deposition of David Isacowitz, President of AIM, ("Isacowitz Dep."), p. 79. Only Brownstone, Icart and AIM have copies of the software.

In May 1990, AIM hired Icart as a programmer analyst. AIM trained Icart in its methods for developing software and imparted information to him about the logic, design and architecture of AIM software. Isacowitz Dep. at 52–54. Icart began working on AIM's account with Brownstone in early 1992, Deposition of Daniel Icart ("Icart Dep.") at 35, and served as a primary analyst for AIM on Brownstone's account. Isacowitz Dep. at 11–12. On June 30, 1993, Icart left AIM for a full-time position at Standard & Poor's ("S & P"). Icart Dep. at 61–64. Within a week of Icart beginning work at S & P, Raymond Chen, Vice President of Brownstone, approached Icart and suggested that Icart work for Brownstone. Icart Dep. at 70. The next week, Icart began doing part-time system design and development work for Brownstone. *Id.* at 81–2. Icart's work expanded upon the AIM system. *Id.* at 84. In April 1994, Icart left his job at S & P and became an independent computer consultant. Id. at 66–67. Sometime in the beginning of 1995, Icart's work for Brownstone involved developing a new computer system. *Id.* at 91–92. Icart currently works as an independent consultant for Brownstone. *Id.* at 101.

The pending motion by Brownstone seeks summary judgment on all of the claims AIM has brought against it.

1. 17 U.S.C. § 117 provides as follows:
    Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:
        (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or
        (2) that such new copy or adaptation is for archival purposes only and that all archival

## DISCUSSION

### I. Summary Judgment Standard

A party seeking summary judgment bears the burden of demonstrating that no genuine issue of material fact exists and that no reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In determining whether there are material issues in dispute, the court must draw all factual inferences and view all factual assertions in favor of the nonmoving party. *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir .1995). If "there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Id.* Conclusory allegations, speculation and conjecture do not create a genuine issue of material fact. *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990).

### II. Copyright Violation

Brownstone asserts that it has not infringed any copyright because its actions fall within the scope of 17 U.S.C. § 117, which allows the owner of a copy of a computer program to make certain copies and adaptations.[1] AIM has not argued that Brownstone's adaptations of the Software fall outside those contemplated by Section 117. *See Aymes v. Bonelli,* 47 F.3d 23, 26 (2d Cir.1995) (holding that Section 117 applies to modifications for internal use). Instead, AIM argues that because Brownstone is a licensee it can not be the "owner of a copy" of the Software entitled to the protection of Section 117. In addressing this claim the court must first determine the meaning of Section 117.

copies are destroyed in the event that continued possession of the computer program should cease to be rightful.
    Any exact copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred, along with the copy from which such copies were prepared, only as part of the lease, sale, or other transfer of all rights in the program. Adaptations so prepared may be transferred only with the authorization of the copyright owner.

## A. *Does Section 117 Apply?*

### 1. *Plain meaning of statute*

■ The first source for determining the meaning of a statute is, of course, its language. Section 117 provides protection to the "owner of a copy of a computer program." Ownership is a "[c]ollection of rights to use and enjoy property, including right to transmit it to others. The complete dominion, title, or proprietary right in a thing or claim. The entirety of the powers of use and disposal allowed by law." Black's Law Dictionary 1106 (6th ed.1990) (citation omitted). The plain meaning of the statute's language thus indicates that "the owner of a copy of a computer program" is one who has complete title to the program.

The legislative history of Section 117 of the Copyright Act reinforces this conclusion. Congress implemented Section 117 to embody "the recommendations of the National Commission on New Technological Uses of Copyrighted Works ["CONTU"] with respect to clarifying the law of copyright ownership of computer software." H.R.Rep. No. 1307, 96th Cong., 2d Sess., Pt. I, at 23 (1980), reprinted in 1980 U.S.C.C.A.N. 6460, 6482; *Aymes*, 47 F.3d at 26. In adopting the CONTU draft for Section 117, Congress made only one change—it replaced the phrase "rightful possessor of a copy" with the phrase "owner of a copy." *See Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 260–61 & n. 11 (5th Cir.1988). While the legislative history, including the Final Report of the National Commission on New Technological Uses of Copyrighted Works (1978) *reprinted in* 3 Comp.L.J. 53, provides no insight into the rationale behind the change, *Id.*; Robert A. Kreiss, *Section 117 of the Copyright Act*, 1991 B.Y.U.L.Rev. 1497, 1537 (1991) ("Kreiss"), Congress clearly intended by this change to limit the beneficiaries of Section 117 to the title owners of a copy of a computer program.

■ The simple conclusion that Section 117 applies only to the owner of a copy of a computer program, however, has proven difficult to apply because software companies frequently license their programs and the licenses do not always distinguish between the copyright and the copy. This distinction is important, however, as Section 202 of the Copyright Act provides:

> Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object . . . does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

17 U.S.C. § 202. As a result of Section 202, a court interpreting a licensing agreement must determine ownership of the copy separately from ownership of the copyright. Melville B. Nimmer and David Nimmer, 2 Nimmer on Copyright § 8.08[B][1] (1996). While some courts have suggested that all licensees are excluded from Section 117, *see, e.g., MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 n. 5. (9th Cir.1993); *Advanced Computer Servs. of Michigan, Inc. v. MAI Sys. Corp.*, 845 F.Supp. 356, 367 (E.D.Va.1994); *CMAX/Cleveland, Inc. v. UCR, Inc.*, 804 F.Supp. 337, 356 (M.D.Ga. 1992), and other courts have applied Section 117 to licensees without explanation, *see, e.g., Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 261 (5th Cir.1988); *Foresight Resources Corp. v. Pfortmiller*, 719 F.Supp. 1006, 1009–10 (D.Kan.1989), it is necessary to determine whether a licensee owns a copy of a computer program in order to determine whether Section 117 applies to that licensee.

## B. *Does Brownstone own a copy of the software?*

■ Determination of whether an agreement transfers ownership of a copy of a computer program requires interpretation of the contract between the parties.[2] Under

---

2. David Nimmer argues that courts may refer to the Uniform Commercial Code (U.C.C.) to determine who is the relevant owner of a copy of a program. Melville B. Nimmer and David Nim-
mer, 2 Nimmer on Copyright § 8.08[B][1] (1996). However, no section of the U.C.C. assists in determining whether a transaction involves transfer of ownership. The current

New York law, the court must determine without resort to extrinsic evidence whether the language of the contract is unambiguous as a matter of law. *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996) (citation omitted). A contract is ambiguous where reasonable minds could differ on what a term means such that there is more than one reasonable construction of the agreement. *Id.* (citations omitted).

■ Brownstone contends that it purchased both the hardware and the software from AIM. AIM argues that it sold the hardware but only licensed the software. AIM focuses on the language incorporating the term "license" in the Agreement, while Brownstone argues that the Agreement, when viewed as a whole, constitutes a purchase of both the hardware and the software despite the use of the term license in the agreement.

The language of the Agreement does not clearly indicate that Brownstone owns a copy of the software. Whereas the Agreement specifically provides that AIM "sells" Brownstone computer hardware, the Agreement grants to Brownstone "a license to use" software and provides that "[a]s part of the license, [Brownstone] will receive object and source code versions of the Application Software." Brownstone argues that even though the Agreement uses the term "license," Brownstone became the owner of a copy of the program because the purported license is perpetual and the only restriction is that it is non-transferable. In support of its contention that it should be considered an owner for the purposes of Section 117, Brownstone cites Professor Raymond Nimmer for the proposition that certain agreements, though deemed licenses, in fact transfer ownership of a copy of the software. Professor Nimmer writes:

Ownership of a copy should be determined based on the actual character, rather than the label, of the transaction by which the user obtained possession. Merely labeling a transaction as a lease or license does not control. If a transaction involves a single payment giving the buyer an unlimited period in which it has a right to possession, the transaction is a sale. In this situation, the buyer owns the copy regardless of the label the parties use for the contract. Course of dealing and trade usage may be relevant, since they establish the expectations and intent of the parties. The pertinent issue is whether, as in a lease, the user may be required to return the copy to the vendor after the expiration of a particular period. If not, the transaction conveyed not only possession, but also transferred ownership of the copy.

Raymond Nimmer, *The Law of Computer Technology* § 1.18[1] p. 1–103 (1992). Essentially, Professor Nimmer's theory is that a single payment for a perpetual transfer of possession is in reality a simple sale of personal property and therefore transfers ownership of that property, the copy of the software. Brownstone's argument that the court should apply Professor Nimmer's theory to the Agreement as a matter of law is unpersuasive because the Agreement is ambiguous on both inputs in Professor Nimmer's equation: the perpetual transfer and the single payment.

· Brownstone's argument that the Agreement constitutes a perpetual transfer of possession misses the mark because it assumes that the perpetual nature of the license applies to the copy. This assumption ignores the provision in the Agreement that Brownstone will receive copies of the Software as "part of the license." This clause suggests that the license applies not to the copy but to the copyright. If the license refers to the

U.C.C., in force in New York, provides rules for determining when title has passed, when the risk of loss has passed, and even what terms form part of the contract, but it provides no guidance as to whether title ever passes under a given agreement. The proposed Section 2B–501 of the U.C.C. would resolve this question by looking first at the contract. In the absence of contractual provisions, the default rules would presume that ownership of the copy rests with the posses-

sor of the copy. National Conference of Commissioners on Uniform State Laws, Uniform Commercial Code, Article 2B, Licenses (draft dated December 12, 1996) <http://www.lawlib.uh.edu/ucc2b/$. This draft, however, reflects only a proposal for new legislation and does not reflect the state of the current law. Thus, there do not currently exist any accepted default rules to clarify an ambiguous license agreement.

copyright rather than to the copy, then the fact that the license is perpetual does not determine the duration of the transfer of the copy because the intellectual property rights are distinct from the personal property rights. *See* 17 U.S.C. § 202 ("nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object"). Brownstone could argue that if the license applies to the copyright, then the transfer of copies "as part of the license" signifies that the duration of the transfer of the copies must equal the perpetual duration of the license of the copyright. However, the phrase "as part of the license" does not unambiguously provide that the terms of the transfer of a copy should be the same as the terms of the copyright license. In short, the court finds it reasonable to interpret the Agreement as a license of the copyright with no terms defining the transfer of a copy.

Even assuming the license unambiguously refers to the copy rather than to the copyright, Brownstone's argument ignores the ambiguity in the Agreement surrounding the other half of Professor Nimmer's equation— the single payment. Brownstone's payments are not made all at once but are divided into three different payment periods. Agreement, ¶ 2. The separation of Brownstone's payment for the software into three different periods suggests that the Agreement is not a simple sale of a copy of software that has been attached to a label of "license." Because the Agreement is not a simple sale masquerading as a license or lease, the court cannot conclude that it unambiguously transfers ownership of a copy of software to Brownstone. Instead, as Professor Nimmer suggests, extrinsic evidence is necessary to understand the parties' intentions. *See Shann v. Dunk*, 84 F.3d 73, 80 (2d Cir.1996) (court may look to extrinsic evidence to determine the intent of the parties to an ambiguous agreement).

The extrinsic evidence in the record does not resolve the ambiguity in the Agreement regarding whether Brownstone owns a copy of the computer program. While David Isacowitz, AIM's president, testified that he did not intend the Agreement to convey to Brownstone the ownership of a copy of software, Isacowitz Dep. at 29, 47, a trier of fact could view the terms of the Agreement as providing for the sale of a copy of the software. Thus, there exists a genuine issue of material fact as to whether Brownstone owns a copy of the software, and summary judgment is inappropriate on Brownstone's claim that Section 117 provides a defense to AIM's copyright claim.

### III. *What is the Scope of the License AIM issued to Brownstone?*

■ Brownstone seeks summary judgment on AIM's breach of contract claim, arguing that Brownstone's use of the software is consistent with the provisions of the Agreement. If true, the Agreement would also serve as a defense to AIM's copyright claim because a copyright owner cannot claim a copyright infringement for activities that he has licensed. *Gilliam v. American Broadcasting Companies*, 538 F.2d 14, 21 (2d Cir.1976). Thus, both the copyright claim and the contract claim are insufficient as a matter of law if the Agreement encompasses Brownstone's activities. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir.1995).

The Agreement provides that AIM grants Brownstone "a license to use" the Application Software, and that license is "perpetual, non-exclusive and non-transferable." AIM claims that the word "use" in the license allows Brownstone only to run the software. *See, e.g.*, Isacowitz Dep. at 29, 47. Brownstone does not believe that the Agreement constitutes a license at all. Because the parties have not fully developed for the court the proper scope of the license that AIM granted to Brownstone, the court cannot conclude as a matter of law whether Brownstone has exceeded the scope of its license. Thus, the court denies the motion for summary judgment on the copyright violation claim and the breach of contract claim at this time and without prejudice to later renewal.

### IV. *Unfair Competition and Misappropriation of Trade Secrets*

■ Brownstone also seeks summary judgment on AIM's claims that Brownstone

misappropriated trade secrets and committed the tort of unfair competition. In order to demonstrate misappropriation of a trade secret, AIM must prove (1) that it possessed a trade secret and (2) that Brownstone is using that trade secret either in breach of an agreement, confidence, or duty or as a result of discovery by improper means. *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir.1990).

New York courts have cited with approval the definition of trade secrets provided by Restatement of Torts § 757, comment b, which defines a trade secret as "any formula pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Ashland Management, Inc. v. Janien*, 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993). Though not explicitly detailed in its Complaint, ¶¶ 28–31, AIM apparently is arguing that it possessed some form of intangible trade secret relating to its method for developing computer software.[3] In particular, AIM alleges that the defendants "infringed AIM's rights by servicing, modifying, and performing maintenance on the Software and in the process by utilizing trade secrets belonging to AIM." Complaint, ¶ 31. For purposes of this motion, the court must assume that unwritten program structuring does exist and that it is a trade secret. *Cf., Integrated Cash Management*, 920 F.2d at 174 (manner in which non-secret computer programs interact constitutes a trade secret).[4] However, AIM must also prove that Brownstone has misappropriated that trade secret.

■■■ Because trade secret law exists to protect "[o]ne who has a trade secret [who] may be harmed merely by the disclosure of his secret to others as well as by the use of his secret in competition with him," Restatement of Torts, § 757, comment c, *quoted in*

*Omnitech Int'l. Inc. v. Clorox Co.*, 11 F.3d 1316, 1325 (5th Cir.1994), a party can prove misappropriation either through improper disclosure or use in competition. There is no allegation that Brownstone disclosed AIM's trade secret to any third party. Additionally, there is no allegation that Brownstone has used the trade secret or will use it in competition with AIM. *Cf., R.W. Sims v. Mack Trucks, Inc.*, 463 F.Supp. 1068, 1070 (E.D.Pa. 1979) (citing Restatement of Torts and finding that Pennsylvania common law tort of misappropriation of trade secrets applies only to competitors); *Omnitech*, 11 F.3d at 1325, 1326 n. 14 (citing Restatement of Torts and finding that Louisiana trade secrets act applies only to competitors). Thus, as a matter of law, AIM cannot prove that Brownstone misappropriated AIM's trade secret. Brownstone's motion for summary judgment on AIM's claim of misappropriation of trade secrets is therefore granted.

■■■ AIM has also raised a claim of unfair competition against Brownstone. While the Second Circuit earlier had found the tort to be "adaptable and capacious" and "capable of mischievous application" because it had been broadly described as "encompassing 'any form of commercial immorality,' " *Roy Export Co. Establishment v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1105 (2d Cir.1982) (Newman, J.) (citations omitted), the Second Circuit now recognizes that the "essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir. 1995) (Newman, C.J.). Brownstone in this case did not attempt to cause any confusion or deceive any third party with regard to AIM's product. Instead, it sought to use the product for itself. Consequently, Brown-

---

3. Brownstone has a license to use the computer program and therefore cannot be misappropriating it.

4. Of course, this unwritten program structuring does not constitute a trade secret that Brownstone could misappropriate if Brownstone could

replicate this information through the use of the computer software it lawfully possessed. *Ashland Management*, 82 N.Y.2d at 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007. Brownstone, however, has not demonstrated that this program structuring could be so replicated.

stone's motion for summary judgment on the unfair competition claim is granted.

### CONCLUSION

For the foregoing reasons, Brownstone's motion for summary judgment is granted as to AIM's unfair competition and misappropriation of trade secrets claims but denied as to AIM's copyright and breach of contract claims.

SO ORDERED.