William KRAUSE dba Special–T software, Plaintiff–Appellant,

v.

TITLESERV, INC., New York Settlement Corp., David Eisenberg, Kenneth Wodiska, Thomas Murphy and James J. Conway, III, Defendant–Appellees.

Docket No. 03–9303.

United States Court of Appeals, Second Circuit.

Argued: Sept. 30, 2004.

Decided: March 21, 2005.

Eugene D. Berman, Fine, Fine & Berman, LLP (Scott J. Fine, on the brief), Melville, NY, for Plaintiff–Appellant.

Ronald J. Rosenberg, Rosenberg Calica & Birney LLP (Kenneth E. Aneser, on the brief), Garden City, NY, for Defendant–Appellees.

Before: LEVAL and KATZMANN, Circuit Judges.*

LEVAL, Circuit Judge.

Plaintiff William Krause appeals from a judgment of the United States District Court for the Eastern District of New York (Thomas C. Platt, *J.*) granting defendants' motion for summary judgment. Krause brought this suit against Titleserv, its owner and CEO, three employees, and an affiliated company (collectively "Titleserv"). The complaint alleged that Titleserv infringed the plaintiff's copyright by modifying the source code of eight computer programs he authored for Titleserv.

Titleserv moved for summary judgment on the basis of 17 U.S.C. § 117(a)(1) (as well as on other grounds). Section 117(a)(1) provides an affirmative defense against copyright infringement for anyone who (i) owns a physical copy of a computer program, (ii) makes an adaptation "as an essential step in the utilization of the computer program in conjunction with a machine," and (iii) uses it "in no other manner." The district court, following the recommendation of Magistrate Judge William D. Wall, concluded there was no genuine issue of material fact and granted summary judgment in favor of Titleserv.

On appeal, Krause challenges the district court's interpretation and application of § 117(a)(1). We affirm.

## BACKGROUND

Between 1986 and 1996 plaintiff Krause performed computer and communications work for Titleserv. He wrote over thirty-five computer programs for Titleserv. The eight programs at issue in this suit were designed to enable Titleserv to track and report on the status of client requests and other aspects of its operations. The programs were installed on Titleserv's computer network and were thus accessible to Titleserv employees.

Krause wrote the programs in Clipper, a DOS-based programming language. Code written in such a programming language is called source code. Source code becomes executable only when it is run through a compiler which converts it into the binary 1s and 0s of object, or executable, code. *See Universal City Studios, Inc. v. Corley,* 273 F.3d 429, 438–39 (2d Cir.2001).

In 1996, Krause and Titleserv began negotiating Krause's assignment of the copyright in his programs to Titleserv in exchange for a five-year consulting agreement. On July 10, 1996, before any agreement was reached, Krause terminated his relationship with Titleserv after learning that Titleserv intended that he take direction from its new Director of Information Technology. When Krause left, he took his notebook computer, which contained the only copies of the source code for two of the programs. He left copies of the source code for the other six disputed programs on the Titleserv file servers because Titleserv had backup tapes, so that in Krause's words, "removing the source from the file servers would have been a meaningless gesture." Krause left executable versions of all eight programs at issue

---

* The Honorable Ellsworth Van Graafeiland, who was a member of the panel, died following argument, and the appeal is being decided by the remaining two members of the panel, who are in agreement. *See* 2d Cir. R. 0.14(b).

on Titleserv's file servers, but locked them with a command, which prevented a popular decompiler from converting the executable code back into source code.

Krause told Titleserv that it was free to continue using the executable code as it existed on the day Krause left, but asserted that Titleserv had no right to modify the source code. Inability to modify the source code would have severely limited the value of those programs to Titleserv. Many routine functions such as the addition of a new customer or a change of a customer address could be performed only by changing the source code. In addition, changes were required to fix bugs from time to time to keep the system from crashing.

On July 16, 1996, Titleserv filed suit against Krause in state court alleging, *inter alia,* misappropriation of its property.[1] Employees of Titleserv subsequently circumvented the "lock" he had placed on the executable code and decompiled it back into source code. An employee then set about "cleaning up" the source code by formatting it, assigning proper variable names, and adding comments. Titleserv made further modifications, including the fixing of bugs, the addition of new customers, and changes in customer addresses, to keep the old programs functional while Titleserv developed a new, Windows-based system. Krause's system was then phased out at some point between late 1997 and early 1998.

Krause brought this suit in the Eastern District of New York. The complaint, as amended, states a single cause of action for copyright infringement based on Titleserv's alleged copying of his programs and its production of derivative works.

After discovery, Titleserv moved for summary judgment. The district court referred the matter to Magistrate Judge Wall, who recommended granting summary judgment in favor of Titleserv on the ground that Titleserv's use and modification of Krause's programs was protected by 17 U.S.C. § 117(a)(1).

On October 30, 2003, the district court adopted the magistrate judge's report and granted summary judgment for Titleserv. *Krause v. Titleserv, Inc.,* 289 F.Supp.2d 316 (E.D.N.Y.2003). Krause then brought this appeal.

## DISCUSSION

This appeal turns on whether Titleserv was entitled to summary judgment on the basis of the affirmative defense provided in 17 U.S.C. § 117(a)(1), as the district court found.[2] Section 117(a) allows the owner of a copy of a computer program to copy or modify the program for limited purposes without incurring liability for infringement. It states:

> Notwithstanding the provisions of section 106 [which generally provides, *inter alia,* that copying of a protected work is an infringement], it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:

1. The state suit was still pending at the time the district court granted summary judgment in the present action. Nothing in the record indicates that the state suit has concluded.

2. Titleserv initially asserted that the programs were "works made for hire" within the meaning of 17 U.S.C. § 201(b). It later asserted entitlement to summary judgment regardless of whether Krause was an independent contractor or employee. For the purposes of its summary judgment ruling, the district court, adopting the magistrate judge's report, assumed *arguendo* that Krause was an independent contractor and owner of the copyright in the programs he developed.

(1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or

(2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.

We are concerned only with subparagraph (1), as Titleserv has not alleged that it copied Krause's programs solely for archival purposes.

To come within the protection of § 117(a)(1) on these facts, Titleserv must demonstrate that the new adaptation of Krause's program (i) was made by the "owner of a copy of [the] computer program"; (ii) was "created as an essential step in the utilization of the computer program in conjunction with a machine"; and (iii) was "used in no other manner."

## I. "[O]wner of a copy of a computer program"

■ Because § 117(a) protects only "the owner of a copy of a computer program," we must first determine whether Titleserv owned the copies of the computer programs at issue. Ownership of a copy is something distinct from copyright ownership. See 17 U.S.C. § 202 ("Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied."). For example, the author of a book, or her assignee, ordinarily owns the copyright in the book and thus the sole right to authorize copying; each purchaser of a copy of the book owns that copy, but is generally not entitled to make copies from it.

It is undisputed that Titleserv *possessed* executable copies of all the programs.

The parties disagree whether Titleserv *owned* those copies within the meaning of § 117(a). Krause claims that Titleserv never owned the program copies saved on its file server, but rather possessed the copies as a licensee pursuant to an oral agreement. Titleserv asserts that it owns copies of the programs because it paid Krause a substantial sum to develop them and has an undisputed right to possess and use them permanently.

Interpreting the word "owner" is more complex than might first appear. Ownership of property is often described as a bundle of rights. See, e.g., *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 160 n. 10, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (observing that for purposes of interpreting the Fourteenth Amendment, a "property interest is not a monolithic, abstract concept hovering in the legal stratosphere. It is a bundle of rights . . . ."). It is not clear from the text of § 117(a) how many and what kind of sticks may be removed from the bundle before the possessor of a copy of a computer program is no longer considered its owner for purposes of § 117(a).

The legislative history of § 117(a) is sparse and provides limited guidance on this point. Section 117(a) was based on the recommendations of the National Commission on New Technological Uses of Copyrighted Works ("CONTU" or the "Commission"). Congress largely enacted the language proposed by the Commission, with one notable exception. The report originally proposed making the affirmative defense of § 117(a) available to the *"rightful possessor* of a copy of a computer program." *Final Report of the National Commission on New Technological Uses of Copyrighted Works* 12 (1978) (emphasis added) [hereinafter *"CONTU Report"*]. Congress changed the term "rightful possessor" to "owner" but did not explain its reason. See H.R.Rep. No. 96–1307(I), at

23 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460, 6482.

Krause contends that Congress's substitution of the word "owner" for the Commission's term, which would have accorded adaptation rights to any "rightful possessor," reveals that Congress intended to restrict the benefit of the statute to title owners. At least one district court has agreed. *See Applied Info. Mgmt. v. Icart*, 976 F.Supp. 149, 153 (E.D.N.Y.1997). Other courts have attached less importance to formal title, looking rather at the various incidents of ownership. The Federal Circuit followed this latter approach in *DSC Communications Corp. v. Pulse Communications, Inc.*, 170 F.3d 1354 (Fed.Cir.1999). *DSC Communications* involved a contributory infringement claim that required the court to determine whether the Regional Bell Operating Companies ("RBOCs") owned copies of the software they transferred regularly onto interface cards. The Federal Circuit concluded that the RBOCs were not owners within the meaning of § 117(a), not merely because the RBOCs did not have title, but rather because licensing agreements with the copyright holder "severely limit[ed] the rights of the RBOCs with respect to the … software in ways that are inconsistent with the rights normally enjoyed by owners of copies of software." *Id.* at 1361. For example, the agreements prohibited the RBOCs from using DSC's software on hardware other than that provided by DSC. *Id.* The agreements also limited the authority of the RBOCs to transfer copies of the software, even though the "first sale" doctrine would have protected certain transfers if the RBOCs had owned copies of the software. *Id.*

In our view, Congress's decision to reject "rightful possessor" in favor of "owner" does not indicate an intention to limit the protection of the statute to those possessing formal title. The term "rightful possessor" is quite broad. Had that term been used, the authority granted by the statute would benefit a messenger delivering a program, a bailee, or countless others temporarily in lawful possession of a copy. Congress easily could have intended to reject so broad a category of beneficiaries without intending a narrow, formalistic definition of ownership dependent on title.

Several considerations militate against interpreting § 117(a) to require formal title in a program copy. First, whether a party possesses formal title will frequently be a matter of state law. *See* 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.08[B][1] (stating that copy ownership "arises presumably under state law"). The result would be to undermine some of the uniformity achieved by the Copyright Act. The same transaction might be deemed a sale under one state's law and a lease under another's. If § 117(a) required formal title, two software users, engaged in substantively identical transactions might find that one is liable for copyright infringement while the other is protected by § 117(a), depending solely on the state in which the conduct occurred. Such a result would contradict the Copyright Act's "express objective of creating national, uniform copyright law by broadly preempting state statutory and common-law copyright regulation." *Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 740, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989); *see also* 17 U.S.C. § 301(a).

Second, it seems anomalous for a user whose degree of ownership of a copy is so complete that he may lawfully use it and keep it forever, or if so disposed, throw it in the trash, to be nonetheless unauthorized to fix it when it develops a bug, or to make an archival copy as backup security.

We conclude for these reasons that formal title in a program copy is not an absolute prerequisite to qualifying for § 117(a)'s affirmative defense. Instead, courts should inquire into whether the party exercises sufficient incidents of ownership over a copy of the program to be sensibly considered the owner of the copy for purposes of § 117(a). The presence or absence of formal title may of course be a factor in this inquiry, but the absence of formal title may be outweighed by evidence that the possessor of the copy enjoys sufficiently broad rights over it to be sensibly considered its owner.

We conclude that Titleserv owned copies of the disputed programs within the meaning of § 117(a). We reach this conclusion in consideration of the following factors: Titleserv paid Krause substantial consideration to develop the programs for its sole benefit. Krause customized the software to serve Titleserv's operations. The copies were stored on a server owned by Titleserv. Krause never reserved the right to repossess the copies used by Titleserv and agreed that Titleserv had the right to continue to possess and use the programs forever, regardless whether its relationship with Krause terminated. Titleserv was similarly free to discard or destroy the copies any time it wished. In our view,

the pertinent facts in the aggregate satisfy § 117(a)'s requirement of ownership of a copy.

Krause responds to this strong evidence of ownership by asserting that Titleserv, acting through its CEO, orally agreed to possess the copies as a mere licensee. He claims evidentiary support in six of his own prior statements. His reliance on these statements, however, confuses ownership of a copyright with ownership of a copy of the copyrighted material. Most of the cited passages, when read in context, relate to the ownership and/or right to use of the copyright, and not to ownership of the copies.[3] Krause's ownership of the copyright in the programs is not disputed, but is irrelevant to Titleserv's rights under § 117(a), which depend on ownership of a copy of the copyrighted material. The final citation is to Krause's deposition in which he gave the conclusory answer "No" when asked "When you left on July 10, 1996, did Titleserv own the copies of the executables?" This conclusory assertion on an issue of law is not sufficient to raise a material issue of fact. *See Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 51, 56 & n. 9 (2d Cir.2003).

We conclude in the absence of other evidence that Titleserv's right, for which it

---

**3.** For example, the first and second citations are to affidavits executed by Krause in which he says that Titleserv's CEO "agreed that any programs which I developed would belong to me." The rest of the paragraph indicates that Krause and Titleserv's CEO were discussing copyright ownership, not ownership of copies of the programs. The third citation is to Krause's complaint in a counter-suit he filed in state court, which alleges that "defendants paid a license fee to plaintiff for the programs developed by him." The complaint also states, "Throughout the time of the relationship, until recently, [Titleserv's CEO] acknowledged plaintiff's ownership of the various computer programs which he developed for defendants." Again, these statements are about copyright ownership. In the fourth citation (to Krause's deposition), it also does not appear that Krause is discussing ownership of program copies, as opposed to the terms of the copyright license. As for the fifth citation, to the extent that it includes Krause's assertion that he "gave [Titleserv] permission to use copies of the programs," perhaps implying Krause's ownership of the copies, Krause's perception that he remained the owner of the copies would not alter our conclusion. This is because, as explained above, our conclusion that Titleserv satisfied § 117(a)'s requirement of "owner[ship]" depends on its possession of sufficient functional incidents of ownership, regardless of title.

paid substantial sums, to possess and use a copy indefinitely without material restriction, as well as to discard or destroy it at will, gave it sufficient incidents of ownership to make it the owner of the copy for purposes of applying § 117(a).[4]

## II. "[C]reated as an essential step in the utilization of the computer program in conjunction with a machine"

■ The next statutory factor Titleserv must satisfy addresses whether Titleserv's modification of the programs was "an essential step in the utilization of the computer program[s] in conjunction with a machine." The district court and the magistrate judge both relied heavily on our decision in *Aymes v. Bonelli*, 47 F.3d 23 (2d Cir.1995) (*Aymes II*) in finding that Titleserv's modifications qualified. *Aymes II* involved programs designed to assist the inventory, record-keeping, and sales functions of a chain of retail stores selling swimming pools and pool supplies. *Id.* at 24. The defendants, which were the users of the programs, modified the programs to keep them up-to-date and to ensure their compatibility with the defendants' successive generations of computer systems. *Id.* at 26. The plaintiff, who owned the copyright in the programs, alleged that the defendants' unauthorized modifications infringed his copyright. We concluded that the modifications were essential to the defendants' utilization of the programs within the meaning of § 117(a)(1) because the "adaptations were essential to allow use of the program[s] for the very purpose for which [they were] purchased." *Id.* at 27.

The modifications allegedly made by Titleserv to its copy of the programs fall into four main categories: (1) correcting programming errors or "bugs," which interfered with the proper functioning of the programs; (2) changing the source code to add new clients, insert changed client addresses, and perform other routine tasks necessary to keep the programs up-to-date and to maintain their usefulness to Titleserv; (3) incorporating the programs into the Windows-based system Titleserv designed and implemented between 1997 and 1998; and (4) adding capabilities, such as the ability to print checks, and, to a limited degree, allowing customers direct access to their records, which made Titleserv's copy of the programs more responsive to the needs of Titleserv's business.

As for the first two types of modifications, a straightforward application of *Aymes II* to the undisputed facts establishes that these modifications constituted "essential step[s] in the utilization of the computer program[s] in conjunction with a machine." The fixing of bugs was done so that the programs would continue to function. Without such fixing, the programs would not function properly. It cannot seriously be disputed that such fixing is "essential." Titleserv's modification of the source code to reflect such business changes as the addition of new customers and changed customer addresses also comes within the scope of the modifications approved in *Aymes II*, which were designed to keep the software in step with changes in the defendants' business.

As for the third type of modifications, involving adaptation of the programs so that they would function on Titleserv's new Windows-based system, we note in passing

---

4. With respect to Krause's claim to have told Titleserv it had no right to modify the programs once he left, Titleserv's entitlement to do what it did arose as a matter of law and Krause's expression of his opinion that it had no entitlement to do these things has no significance whatsoever.

that Titleserv vigorously denies Krause's allegation that it copied his programs into the new system. In adjudicating Titleserv's motion for summary judgment, however, we must utilize the version of the evidence most favorable to Krause, drawing all permissible inferences in his favor. *Cifarelli v. Vill. of Babylon,* 93 F.3d 47, 51 (2d Cir.1996). Utilizing that standard to assume that Titleserv did incorporate copyrighted matter from Krause's programs into its new system, we nonetheless conclude, following *Aymes II,* that such adaptation qualifies under § 117(a)(1) as an "essential step." In *Aymes II,* we reached the same conclusion as to the defendants' adaptation of their copy of the software so that it would continue to function on the defendants' new computer system. 47 F.3d at 26–27.

The only category of Titleserv's modifications requiring additional analysis is the fourth category: the addition of new features, such as check printing and providing for direct client access. Such changes were not strictly necessary to keep the programs functioning, but were designed to improve their functionality in serving the business for which they were created.

Focusing on § 117(a)(1)'s use of the word "essential," Krause argues that an adaptation or change does not come within the protection of § 117(a)(1) unless it is truly necessary to the functioning of the system. He thus argues that, while the fixing of bugs may be permitted because such repairs are "essential" to keep the program operating, adaptations that improve the functionality of the system but are not required to keep it operational cannot qualify.

We already implicitly rejected Krause's argument in *Aymes II.* In that case, some of the program changes approved by our ruling as falling within the protection of § 117(a)(1) had nothing to do with enabling the programs to continue functioning; they rather involved adapting the programs to changes in the defendants' business. For example, the *Aymes II* defendants changed product lines, from gas barbecues to ceiling fans to swimming pool supplies, and the alterations of the programs were designed to maintain the utility of the programs in connection with these changes in product lines. Joint App. at I2–3, *Aymes II,* 47 F.3d 23. Unless we were to retreat from that ruling, we would be compelled to reject the narrow reading of § 117(a)(1) which Krause urges on us.

We see no reason to retreat from *Aymes II.* The statute is ambiguous on the point in question. The word "essential" is defined as "necessary, indispensable," or "unavoidable." *See Webster's Third New International Dictionary* 777 (1976). In use, its meaning varies considerably from one context to another. For example, one might say it is "essential" when driving a car to stay alert. This does not mean it is impossible to drive a car without being alert, but rather stresses the importance of staying alert. Similarly, one might ask an "essential" question. This does not mean the question had to be asked, but rather that it goes to the heart of the matter.

"Essential" is often used as a synonym of "necessary," as indicated by its dictionary definition. Particularly as used in the law, the word "necessary" is ambiguous. According to *Black's Law Dictionary,* the word is "susceptible of various meanings. It may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought." *Black's Law Dictionary* 928 (5th ed.1979); *Black's Law*

*Dictionary* 1181 (rev. 4th ed.1968).[5] *See also M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 388, 4 L.Ed. 579 (1819) ("The word *necessary,* standing by itself, has no inflexible meaning; it is used in a sense more or less strict, according to the subject."). The same ambiguity inheres in the word "essential," which in some of its meanings is effectively synonymous with "necessary." We reject Krause's contention that the word "essential" can apply only to a modification without which the program could not function.

Moreover, Krause focuses too narrowly on the word "essential." The meaning of the phrase "an essential step in the utilization of the computer program" is equally dependent on the word "utilization." The dictionary defines "utilize" as "to make useful," "turn to profitable account or use," "make use of," and "convert to use." *Webster's Third New International Dictionary* at 2525. This definition sheds little light on what the word "utilization" means in the context of § 117(a)(1). "Utilization" of a computer program might refer exclusively to booting and running the program, in which case only limited modification, such as fixing bugs to prevent the program from crashing, might qualify as an "essential step" in booting or running the program. On the other hand, "utilization" might refer more broadly to "mak[ing] [the program] useful" to the owner of the copy, in which case more extensive modification that involved adding new program features to enhance functionality might qualify as an "essential step" in making the program useful. Accordingly, even if the word "essential" is given a narrow meaning, encompassing only absolute necessity, § 117(a)(1) remains ambiguous because the statute does not clearly indicate *for what end* modifications must be absolutely necessary.

In arguing that § 117(a)(1) authorizes only adaptations absolutely necessary to make a program boot or run, Krause contends that his interpretation is required to avoid rendering the phrase "in conjunction with a machine" superfluous. His argument goes as follows: Because a computer program inevitably functions on a machine, the statutory words "in conjunction with a machine" would be tautological and unnecessary if given their ordinary meaning. On the assumption that Congress intends every portion of a statute to have meaning, the phrase "in conjunction with a machine" must therefore place an additional limitation on the scope of § 117(a)(1). That limitation restricts the meaning of "essential step" to those modifications absolutely necessary to make a program boot and run.

Krause is mistaken in suggesting that the words "in conjunction with a machine" are tautological if given their plain meaning. Those words can serve to broaden § 117(a)(1) by making clear that the utilization of a program does not need to be in conjunction with what we conventionally call a computer, but can be in conjunction with a range of machines driven in part by computer programs, such as automobiles, airplanes, and air conditioners. Furthermore, even if the statute used the phrase "in conjunction with a computer," we would see no reason to ascribe specialized meaning to the phrase simply for the sake of avoiding slight repetition in the statutory text. Some repetition can help clarify the meaning of a statute, and we are reluctant to endorse an awkward reading of its words for no better reason than to satisfy

---

5. The sixth edition of *Black's* contains the same definition, but *Black's* thereafter stopped defining the word "necessary." Compare *Black's Law Dictionary* 1058 (8th ed.2004), *and Black's Law Dictionary* 1052 (7th ed.1999), *with Black's Law Dictionary* 1029 (6th ed.1990).

the canon of construction that cautions against "adopt[ing] a construction making another statutory provision superfluous." *Hohn v. United States,* 524 U.S. 236, 249, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998). As we have noted previously, "[g]eneral principles of statutory construction are notoriously unreliable" and "should not take precedence over more convincing reasons." *Hakala v. Deutsche Bank AG,* 343 F.3d 111, 116 (2d Cir.2003). The Supreme Court has recognized in particular that the "preference for avoiding surplusage constructions is not absolute." *Lamie v. United States Tr.,* 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004). We therefore reject Krause's argument and conclude that the phrase "in conjunction with a machine" does not cure the ambiguity of the statutory text.

Given the ambiguity of the text, we turn to the legislative history of § 117(a) for guidance. As discussed above, Congress enacted the language proposed in the CONTU Report largely without alteration. The House Report simply states that § 117(a) "embodies the recommendation" of CONTU. H.R.Rep. No. 96–1307(I), at 23 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460, 6482. We therefore look to the CONTU Report for indications of Congressional intent. *See Aymes II,* 47 F.3d at 26–27; *see also Vault Corp. v. Quaid Software Ltd.,* 847 F.2d 255, 260–61 (5th Cir.1988); *Foresight Res. Corp. v. Pfortmiller,* 719 F.Supp. 1006, 1009 (D.Kan. 1989).

Krause asserts that the CONTU Report supports his interpretation of § 117(a)(1). He contends the Commission was primarily concerned with compatibility as between program and computer, which was of particular concern at the time the Report was issued in 1978, during the early stages of personal computer development. His argument relies heavily on one sentence in the report, which says: "Because of a lack of complete standardization among programming languages and hardware in the computer industry, one who rightfully acquires a copy of a program frequently cannot use it without adapting it to that limited extent which will allow its use in the possessor's computer." *CONTU Report* at 13.

Other passages of the report, however, describe the right to modify programs in a manner that goes far beyond concern with compatibility and strongly suggests that the writers of the CONTU Report envisioned a loose concept of necessity that would encompass our very issue—the addition of features so that a program better serves the needs of the customer for which it was created. The report states:

> Thus, a right to make those changes necessary to enable the use for which it was both sold and purchased should be provided. The conversion of a program from one higher-level language to another to facilitate use would fall within this right, *as would the right to add features to the program that were not present at the time of rightful acquisition.*

*Id.* (emphasis added). Without question, the CONTU Report, in the italicized text, specifically contemplates protection for modifications adding features, rather than merely securing continued functioning of what was originally created. The CONTU Report thus persuasively rebuts Krause's narrow reading of § 117(a)(1), which would authorize only changes needed to permit the program to function.

The question remains whether the changes Titleserv made to its copies of Krause's programs come within § 117(a)(1)'s broader concept of an "essential step in the utilization of the computer program in conjunction with a machine." We can see no reason why the modest alterations to Titleserv's copies of the pro-

grams should not qualify. We need not address whether other types of improvements might be too radical, or might fail to qualify because they somehow harm the interests of the copyright owner. The sentence of the CONTU Report after the one speaking of the right to add features states that the rights granted by § 117(a) could "only be exercised so long as they did not harm the interests of the copyright proprietor." *CONTU Report* at 13. A different scenario would be presented if Titleserv's alteration somehow interfered with Krause's access to, or ability to exploit, the copyrighted work that he authored, or if the altered copy of Krause's work were to be marketed by the owner of the copy. But on our facts, we see no harm whatsoever to Krause's enjoyment of his copyright. The changes made by Titleserv were made only to its copies of Krause's programs. Krause enjoyed no less opportunity after Titleserv's changes, than before, to use, market, or otherwise reap the fruits of the copyrighted programs he created.

Taking into account the ambiguity of the concepts of "essential" and "utilization," and construing § 117(a) in light of the *CONTU Report* which Congress followed, we conclude that Titleserv's changes to its copy of Krause's programs were "essential step[s] in the utilization of the computer program[s] in conjunction with a machine" within the meaning of § 117(a)(1).

### III. "[U]sed in no other manner"

■ Finally, § 117(a)(1) requires that the adaptation created as an essential step in the utilization of a computer program in conjunction with a machine be "used in no other manner." Krause contends Titleserv cannot satisfy this requirement because it (1) shared copies of the programs with its subsidiaries, and (2) granted two client banks dial-up access to the programs for a period of approximately one year. He points to a passage from *Aymes II* in which we wrote:

> Finally, there is no merit to Aymes's suggestion that defendants infringed his copyright because they used the programs in an unauthorized manner and for an external purpose. The district court found that [the parent company] used [the programs] for internal business purposes only and did not distribute the program[s] to its subsidiaries.

*Aymes II*, 47 F.3d at 27 (internal citations omitted). Krause contends this passage conveys by negative implication that § 117(a)(1) does not allow the owner of an adapted copy of a program to share that adaptation with its subsidiaries, much less others. Krause reads too much into this dictum. At most it meant that since there had been no sharing with a subsidiary, the court did not need to consider the argument here advanced that such sharing would defeat the claim.

Whether a questioned use is a use *in another manner* seems to us to depend on the type of use envisioned in the creation of the program. The programs Krause designed for Titleserv were intended to run on Titleserv's file server, where they would be accessible to Titleserv's subsidiaries. These programs were, in other words, designed for use by Titleserv and its subsidiaries. The fact that such use by Titleserv and its subsidiaries continued after Krause's departure does not make such use a use *in another manner*. The use by the subsidiaries was merely a continuation of the kind of use for which the programs were intended.

Although Krause's argument is slightly stronger with respect to his allegation that Titleserv also made the programs available to two client banks through a dial-up connection, we find this argument insufficient as well. In support, Krause points

to a passage in a National Science Foundation report submitted to CONTU, which states: "The right to internal use should not include the right to make the work available to outsiders via a computer network or otherwise." *See Apple Computer, Inc. v. Formula Int'l, Inc.*, 594 F.Supp. 617, 621 (C.D.Cal.1984) (quoting R. Saltman, *Computer Science and Technology: Copyright in Computer-Readable Works: Policy Impacts of Technological Change*, NBS Special Publication 500–17 (Oct. 1977), *reprinted in* III *Copyright, Congress and Technology: The Public Record* 368 (N. Henry ed., 1980)) (emphasis removed).

We think, however, that Krause's argument misses the mark. First, the sentence he quotes appeared in a document submitted to CONTU, not in the CONTU Report. Second, whether a questioned use of an adaptation violates the requirement of "use in no other manner" depends on the facts of the particular case. The programs Krause designed for Titleserv were designed for the processing of transactions relating to Titleserv's relationship with its customers. For purposes of the "in no other manner" requirement, it seems to us to make little difference whether the programs are accessed and operated by Titleserv's personnel or the personnel of the customer in carrying out or checking on its transactions with Titleserv. What is important is that the transaction for which the programs are used is the type of transaction for which the programs were developed. Where the programs were designed to aid Titleserv in ordering its transactions with client banks, an adaptation which allows the programs to be accessed directly through a dial-up connection by the client bank, rather than exclusively by Titleserv's personnel at the request of the client bank, does not seem to us to violate § 117(a)(1)'s "in no other manner" requirement. It is not as if Titleserv made the programs available to clients to use in their own transactions independent of Titleserv. Titleserv simply increased the versatility of the programs by allowing them to report on Titleserv's transactions with its clients either at the direction of Titleserv personnel or of the client. This constitutes use in the *same* manner, with the benefit of an adaptation increasing versatility.

We conclude that Titleserv demonstrated entitlement to summary judgment under § 117(a). In the terms of § 117(a), it was "not an infringement" for Titleserv, as the "owner of a copy of a computer program to make ... [an] adaptation" where such adaptation was "created as an essential step in the utilization of the computer program in conjunction with a machine and ... it [was] used in no other manner."

## CONCLUSION

The judgment of the district court is affirmed.