17-2748-cv
*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2018

(Argued:    September 21, 2018          Decided:    May 8, 2019)

Docket No. 17-2748-cv

UNIVERSAL INSTRUMENTS CORPORATION,

*Plaintiff-Counter-Defendant-Appellant,*

*v.*

MICRO SYSTEMS ENGINEERING, INC.,
MISSOURI TOOLING & AUTOMATION, INC.,

*Defendants-Counter-Claimants-Appellees.*\*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

Before:
        WALKER and CHIN, *Circuit Judges*, and KEENAN, *District Judge.*\*\*

---

\*        The Clerk of Court is respectfully directed to amend the official caption to conform to the above.

\*\*        Judge John F. Keenan, of the United States District Court for the Southern District of New York, sitting by designation.

Appeal from a judgment entered in the United States District Court for the Northern District of New York (Sharpe, *J.*), dismissing plaintiff's claims for breach of contract, copyright infringement, misappropriation, and unfair competition arising from its sale of equipment and software for an automated assembly system. On appeal, plaintiff contends that the district court erred in granting defendants' motion for judgment as a matter of law.

AFFIRMED.

---

AMY MASON SAHARIA (Kannon K. Shanmugam, Giselle Barcia, Stacie M. Fahsel, *on the brief*), Williams & Connolly LLP, Washington, D.C.; Anthony L. Meola, Christopher E. Blank, Victor J. Baranowski, Schmeiser, Olsen & Watts LLP, Latham, New York, *for Plaintiff-Counter-Defendant-Appellant Universal Instruments Corporation*.

DAVID B. TULCHIN (Thomas C. White, Adam R. Brebner, Jacob B. Lieberman, *on the brief*), Sullivan & Cromwell LLP, New York, New York, *for Defendants-Counter-Claimants-Appellee Micro Systems Engineering, Inc.*

Howard J. Kaplan (Marie E. Christiansen, *on the brief*), Kaplan Rice LLP, New York, New York, *for Defendants-Counter-Claimants-Appellee Missouri Tooling & Automation, Inc.*

---

CHIN, *Circuit Judge*:

Plaintiff-counter-defendant-appellant Universal Instruments Corporation ("Universal") developed and sold an automated assembly system to defendant-counter-plaintiff-appellee Micro Systems Engineering, Inc. ("MSEI") in 2007 pursuant to a purchase agreement. MSEI developed a multi-phase plan to build a system to automate the handling of medical devices during its quality testing process, and Universal won the bid to provide the equipment for the first phase. MSEI awarded the second and third phases of the project not to Universal, but to Universal's competitor, defendant-counter-plaintiff-appellee Missouri Tooling & Automation, Inc. ("MTA"). In implementing phases two and three, MSEI and MTA used intellectual property, including computer source code, that Universal had provided for phase one.

Universal brought this action below alleging, *inter alia*, that MSEI and MTA had infringed Universal's copyright in its source code, breached the terms of the purchase agreement, and misappropriated Universal's trade secrets. Certain claims were dismissed on defendants' motion for judgment on the pleadings, and, after discovery, the parties proceeded to a jury trial on the

3

remaining claims. At the close of the evidence, however, the district court granted defendants' motion for judgment as a matter of law. Universal appeals.

For the reasons set forth below, we affirm the judgment of the district court.

## BACKGROUND

**A.** *Factual Background*

MSEI is a medical device company that designs and manufactures electronics for implantable pacemakers and defibrillators. Before selling these components, MSEI subjects them to a battery of tests to ensure they are working properly. MSEI sought to automate its then manual system of moving components from one test station to another; to that end, MSEI solicited bids for the development of a Test Handling System (the "THS"). MSEI sought to build the THS in phases. The first phase would automate the handling of some product testing stations with further automation to be added in subsequent phases.

Beginning in 2006, MSEI obtained bids from suppliers for phase one. One of the bidders was Universal, a developer of automated assembly platforms. MSEI awarded phase one to Universal, and the parties memorialized their

4

agreement in an Equipment Purchase Agreement (the "EPA"), executed in June 2007.

The THS ultimately developed by Universal had two software components: the station software and the server software. The station software was embedded on each individual Polaris station and "manage[d] the operation of conveyors, elevators, stacks and robotic arms." J. App'x at 2606. This software was stored on each station's programmable logic controller and could be downloaded on site by physically connecting a computer to the station and downloading the source code. *Id.* at 1299-1300, 1480-81, 1532-34. The server software, on the other hand, was the "brains of the operation," *id.* at 988, which "synchronize[d] the activities of the hardware and software" and was "responsible for coordinating the movement of the module trays," *id.* at 2606. The source code for the server could not be downloaded in the same way as the station software, and under the EPA, Universal was under no obligation to provide the server source code to MSEI. *Id.* at 2344 (providing that "source code will not be provided"). The parties agreed, however, in their Final Customer Acceptance letter (the "FCA") that Universal would provide MSEI with a copy of

the server source code at the time of delivery. The THS was delivered in October 2008.

In 2009, MSEI solicited bids for the next phase ("THS2"). The bid documents for THS2 indicated that MSEI had the responsibility to provide the software for the station and server source code to be used in the project. In April 2010, MSEI awarded the project to MTA, a competitor of Universal, which submitted a lower bid for the project. On April 8, 2010, MSEI and MTA entered into an agreement (the "MTA Agreement"). On April 16, Universal and MTA were notified by email that MSEI had "awarded the business to MTA for the THS line two project." J. App'x at 2878. MTA subsequently sought to purchase Polaris stations from Universal for use in THS2, but on August 4, 2010, Universal declined to sell them to MTA. Thereafter, MSEI downloaded the source code from the individual Polaris stations and the server source code that Universal gave to MSEI on delivery of phase one; it then gave the code to MTA to use in the production of THS2. MSEI and MTA subsequently modified the server source code to meet the requirements of THS2.

The EPA contains several provisions relating to the parties' intellectual property rights.  Section 8 is entitled "Intellectual Property."  Section 8.2(d) provides that

> [i]f [Universal] uses any Pre-Existing Intellectual Property in connection with this Agreement, [Universal] hereby grants MSEI, MSEI's subcontractors, or suppliers, a non-exclusive, royalty-free, worldwide, perpetual license, to use, reproduce, display, of the Pre-Existing Intellectual Property for MSEI's internal use only.

J. App'x at 2336.  "Pre-Existing Intellectual Property" is defined as "any trade secret, invention, work of authorship, mask work or protectable design that has already been conceived or developed by anyone other than MSEI before [Universal] renders any services under the Agreement."  *Id.*

Exhibit E to the EPA, entitled "Equipment Acceptance Form," contained a blank form for the parties to fill in upon final delivery and acceptance.

On October 31, 2008, Universal and MSEI signed a negotiated "Final Customer Acceptance" letter, which stated, among other things, that Universal

> agrees to provide the THS server code as is with the understanding that MSEI assumes the risk of invalidating the warranty in the event a change made by MSEI to the source code causes damage to any of the THS line hardware.

J. App'x at 2361.

7

**B.**     *Procedural Background*

On July 15, 2013, Universal brought this action against MSEI and MTA in the Northern District of New York, alleging copyright infringement, misappropriation of trade secrets, breach of contract, unfair competition, unjust enrichment, and promissory estoppel. On February 24, 2017, the district court granted judgment on the pleadings and dismissed Universal's claim for promissory estoppel and its claims against MSEI for unjust enrichment and unfair competition. Universal does not challenge those rulings on appeal.

In July and August of 2017, the parties proceeded to trial before a jury on the remaining claims -- breach of contract, copyright infringement, misappropriation of trade secrets, and as to MTA only, unjust enrichment[1] and unfair competition. After the close of Universal's case-in-chief, the district court reserved judgment on defendants' motion for judgment as a matter of law. After six days of trial and following the close of the evidence on August 7, the district court orally granted defendants' renewed motions for judgment as a matter of law. As the district court explained: "The whole issue here is whether or not

---

[1]     Universal has abandoned on appeal its claim against MTA for unjust enrichment. It has thus waived any challenge to the ruling below. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

8

under the arrangements between the parties, contractual and otherwise, MSEI had permission and/or ownership in the property that was transmitted to them." Spec. App'x at 3. The district found as a matter of law that Universal (1) had a protected intellectually property interest in the system source code, (2) transferred copies of that property to MSEI, and (3) offered no evidence that MSEI had exceeded the scope of its license under the EPA by giving MTA the intellectual property. These findings were dispositive of all claims. The court reaffirmed its ruling in a nine-page order issued the following day. It entered judgment August 9, 2017.

This appeal followed.

### DISCUSSION

Universal argues that the district court erred in granting defendants' renewed motion for judgment as a matter of law. In short, it contends that the district court's construction of the EPA is incorrect as a matter of law and that it demonstrated the existence of factual questions that should have been resolved by a jury.

The district court based its grant of judgment as a matter of law on a number of overlapping grounds: it ruled that (1) the license granted by

9

Universal to MSEI pursuant to § 8.2(d) of the EPA authorized MSEI and MTA's use of the source code; (2) the Final Customer Acceptance letter granted MSEI ownership of the source code; (3) the evidence offered by Universal as to damages was insufficient as a matter of law; (4) Universal's copyright and misappropriation of trade secrets claims were time barred; (5) Universal's breach of contract claim was preempted by the Copyright Act; and (6) Universal's copyright claim failed because MSEI's use of the source code was authorized by 17 U.S.C. § 117(a).

We review *de novo* both the grant of judgment as a matter of law and the district court's construction of the agreements. *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007); *Cash v. Cty. of Erie*, 654 F.3d 324, 332-33 (2d Cir. 2011). In reviewing a grant of judgment as a matter of law, we construe the evidence in the light most favorable to Universal, drawing all reasonable inferences in its favor, and without making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

It is undisputed that in completing phases two and three, MSEI and MTA used source code that Universal had provided for phase one. The principal

10

issue presented is whether the EPA permitted them to do so.  We hold that defendants' conduct did not breach § 8.2(d) of the EPA and was non-infringing because that provision permitted defendants to reproduce and use the station and server source code; defendants' adaptation of the server source code was non-infringing because it was authorized by 17 U.S.C. § 117(a); Universal's contract claim that defendants' modification of the server source code breached the EPA is preempted by the Copyright Act; Universal's claim of misappropriation of trade secrets is time-barred; and MTA did not unfairly compete with Universal because its conduct was not in bad faith.  Accordingly, we affirm.

I.    *Copyright Infringement*

A.    *Applicable Law*

Universal's copyright infringement claim turns on whether defendants' conduct fell within the scope of the non-exclusive license provided in the EPA.  This is so because a valid license "immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor."  *Davis v. Blige*, 505 F.3d 90, 100 (2d Cir. 2007).  Where a claim turns on the scope of a license, "the copyright owner bears the burden of

11

proving that the defendant's [use] was unauthorized." *Tasini v. N.Y. Times Co.*, 206 F.3d 161, 171 (2d Cir. 2000) (quoting *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995)).

Whether the parties' license agreement encompasses the defendants' activities is "essentially" a question of contract interpretation. *See Bourne*, 68 F.3d at 631. "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (citing *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 32 (2002)).[2] Where, however, "the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, then the interpretation of the contract becomes a question of fact for the jury and extrinsic evidence of the parties' intent properly is admissible." *Bourne*, 68 F.3d at 629 (internal quotations marks omitted). The existence of an ambiguity, if any, is to "be ascertained from the face of an agreement without regard to extrinsic evidence." *Reiss v. Fin. Perf. Corp.*, 97

---

[2] The EPA does not contain a choice-of-law provision, but the parties agree that New York law applies. *See Federal Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (noting that where, during the course of litigation, "the parties agree that New York law controls, this is sufficient to establish choice of law").

N.Y.2d 195, 199 (2001); *see also Duane Reade Inc. v. St. Paul Fire & Marine Ins. Co.,* 411 F.3d 384, 390 (2d Cir. 2005).

**B.**     *Application*

We first consider whether the EPA unambiguously permitted MSEI to transfer the source code to MTA for reproduction and use in subsequent phases of the THS. We next consider whether MSEI or MTA's modification of Universal's pre-existing intellectual property was infringing. We hold, for the reasons discussed below, that the EPA unambiguously permitted MSEI and MTA to reproduce and use Universal's pre-existing intellectual property in subsequent phases of the THS. Defendants' conduct was, therefore, not infringing. We further conclude that MSEI and MTA's adaptation of the server source code for use in additional testing stations was authorized by 17 U.S.C. § 117(a) and thus non-infringing.

**1.**     *Section 8.2(d) of the EPA Unambiguously Permitted MSEI and MTA to Reproduce Universal's Pre-Existing Source Code*

Universal argues that the EPA plainly prohibited MSEI from furnishing MTA with the server and station source code to replicate the THS. It argues in the alternative that the relevant provisions of the EPA are ambiguous and that therefore their interpretation could not be resolved as a matter of law.

13

We disagree and hold that the EPA unambiguously permitted MSEI and MTA to reproduce Universal's source code for use in subsequent phases of the THS -- conduct that constituted internal use.

Section 8.2(d) of the EPA provides that "[i]f [Universal] uses any Pre-Existing Intellectual Property in connection with this Agreement, [Universal] hereby grants MSEI, MSEI's subcontractors, or suppliers, a non-exclusive, royalty-free, worldwide, perpetual license to, use, reproduce, display, of the Pre-Existing Intellectual property for MSEI's internal use only." J. App'x at 2336. It was Universal's burden to prove that MSEI exceeded the scope of this license. *See Tasini*, 206 F.3d at 171. To do so, it was required to prove that (1) MSEI or its "subcontractor" or "supplier" (2) did more than "use, reproduce, display" for MSEI's "internal use only" (3) Universal's "Pre-Existing Intellectual Property."

First, MTA is a "supplier" of MSEI. The plain meaning of "supplier" unambiguously includes a component manufacturer like MTA. *See Supplier*, Black's Law Dictionary (10th ed. 2014) (defining "supplier" as "[a] person or business engaged, directly or indirectly, in making a product available to consumers"); *Supplier*, Oxford English Dictionary (2d ed. 1989) (defining "supplier" as "one who . . . furnishes something needed"). Indeed, in its trial brief

14

to the district court, Universal twice used the term "supplier" in reference to MTA. J. App'x at 679, 685. Universal's argument that MTA is not a supplier thus fails.

Second, MSEI and MTA had license to "use, reproduce, display" the intellectual property for MSEI's "internal use only." J. App'x at 2336. The plain meaning of "internal use" clearly and unambiguously encompasses MSEI's agreement to permit its supplier to use the software to produce subsequent phases of the THS. There is no evidence that the source code was used by MSEI and MTA for anything other than developing and implementing phases two and three of MSEI's internal test handling system.

Universal contends that "internal use" was meant to limit the license of "third parties -- subcontractors and suppliers -- whose products, components, or services MSEI would be using internally as it tested products on Universal's THS line" at MSEI's premises. Appellant's Br. at 25; *see also* Appellant's Reply Br. at 12 ("MSEI's *external* provision of Universal's software *to MTA to build the lines* violated Section 8.2(d)." (emphasis in original)). We are unconvinced.

This argument is premised on a physical internal-external dichotomy, whereby a supplier's "use, reproduc[tion], [or] display" of Universal's

intellectual property on MSEI's premises would be permitted, while the same use or reproduction off site would violate the license.  But this cannot be the parties' intent, because by its terms the license is "worldwide" in scope and extends to MSEI's suppliers and subcontractors.  *See* EPA § 8.2(d).  A license cannot simultaneously be worldwide and limited to the physical confines of the licensee's premises.  The more natural understanding of "internal use" in this context is that the pre-existing intellectual property could be used by or for MSEI's existing business -- not for resale or for the use or benefit of others.  *See Internal*, Oxford English Dictionary (3d ed. 2015) (defining "internal" as "affairs and activities within an institution, organization, department, etc.; relating to such affairs or activities; applying or used within an organization"); *see also Analect LLC v. Fifth Third Bancorp*, 380 F. App'x 54, 58 (2d Cir. 2010) (summary order) (finding that contract prohibiting resale and distribution by purchaser did not prohibit "internal use"); *Norwest Corp. v. C.I.R.*, 110 T.C. 454, 458 (1998) ("[P]etitioner engaged in numerous projects involving the development of internal use software -- that is, software developed solely for petitioner's internal business and management purposes.").  In the context of computer software, the

16

on-premises, off-premises distinction makes even less sense, given the nature of software and source code.

This understanding is reinforced by our recent holding that "under long-established principles of agency law, a licensee under a non-exclusive copyright license may use third-party assistance in exercising its license rights unless the license expressly provides otherwise." *Great Minds v. Fedex Office & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018). Here, the license expressly provided that the rights extended to MSEI's suppliers, which surely included MTA. Hence, MSEI and MTA's reproduction of the source code for MSEI's internal use did not, as a matter of law, exceed the scope of the license. Because there is nothing in the record to suggest that the source code was used for anything other than for MSEI in subsequent phases of its THS, MSEI's provision of the source code to MTA and MTA's use of the source code for MSEI'S benefit did not exceed the scope of the license, and thus was non-infringing.

### 2. *Modification of the Source Code was Authorized by 17 U.S.C. § 117(a)*

We turn next to the question whether MSEI and MTA did more than "use, reproduce, [or] display" Universal's pre-existing source code -- that is,

17

whether it modified the source code and, if so, whether the modification infringed Universal's copyright.

### a. *MSEI and MTA Modified the Server Source Code*

As Universal contends, evidence at trial showed that the server source code that MSEI possessed differed from that delivered by Universal in October of 2008. Universal's expert witness Richard Hooper was "asked to compare two sets of server source code." J. App'x at 1719. The first set of source code was the THS server source code that Universal had in its files. The second set was the source code as it existed on MSEI's system at the time it was produced in the course of litigation. Hooper testified that the server source code consists of twenty or thirty individual files "that hold the source code," which have descriptive names like "AssemblyStationManager," "LogStationManager", "MessageManager," "RF/ShakerManager," and "FeederShakerManager." *Id.* at 1720-23. He proceeded to show the jury a demonstrative, which included excerpted line-by-line comparisons of the Universal and MSEI source code. He noted that although the codes were nearly "identical," there were "some changes that were made to the MSEI source code." *Id.* at 1724. For instance, the "LogStationManager" files were "99.4 percent . . . exactly the same." *Id.* at 1725. Hooper concluded that "MSEI started with the Universal source code and then

18

made some changes to it. They added lines of code to it and they deleted lines of code from it." *Id.* He also concluded that none of the source code was publicly available.

The conclusion that the server source code was modified by MSEI or MTA after delivery by Universal was reinforced by Christopher Demuth, who helped Universal to develop the sever source code and was subsequently hired by MSEI to make modifications. DeMuth testified that in October 2009, MSEI contacted him with a "punch list of some features they wanted added, some changes they wanted made to help improve efficiency of the line." *Id.* at 1633. He made various modifications over the course of several years, in particular because MSEI was "working on building another THS line and they needed modifications to the THS server to support . . . communicating with all of the [new] stations." *Id.* at 1635-38. Thus, the server source code was modified.

Unlike the server source code, Universal does not seriously contend that MSEI and MTA modified the station source code. Indeed, there is nothing in the voluminous record indicating that the station software was modified. Although the MTA Agreement indicates that MTA would be required to "[m]odify, if necessary, and install SW" (SW means software) for each of the

19

stations, *id.* at 2434-35, it would be speculative to conclude, without something more, that the station software was actually modified. We therefore proceed to consider only whether MSEI's modification of the server source code was authorized by 17 U.S.C. § 117(a).

**b.** *The Server Source Code Modifications Were Authorized by 17 U.S.C. § 117(a)*

It is axiomatic that "[a]n unlicensed use of the copyright is not an infringement unless it conflicts with one of the specific exclusive rights conferred by the copyright statute." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 447 (1984). The Copyright Act grants copyright holders a bundle of exclusive rights, including the rights to "reproduce . . . in copies," "prepare derivative works," "distribute copies," "perform," and "display" their works. 17 U.S.C. § 106. Source code, the human-readable literal elements of software, is copyrightable. *See Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1355-56 (Fed. Cir. 2014). It is also well established that copyright owners may grant others license to use their rights. *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 410 (2d Cir. 2018). But because copyright licenses prohibit any use not authorized, a licensee infringes the owner's copyright if its use exceeds the scope of its license. *Gilliam v. Am. Broad. Cos.*, 538 F.2d 14, 20 (2d Cir. 1976) (noting that "[o]ne who obtains

20

permission to use a copyrighted" work "may not exceed the specific purpose for which permission was granted" and concluding that "unauthorized editing of the underlying work, if proven, would constitute an infringement of the copyright in that work similar to any other use of a work that exceeded the license granted by the proprietor of the copyright"); *see also S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989). Thus, § 8.2(d) of the EPA arguably prohibits, at least impliedly, MSEI and its suppliers from modifying Universal's pre-existing intellectual property.

The Copyright Act, however, provides an affirmative defense that allows the owner of a copy of a computer program to copy or modify the program for limited purposes without incurring liability for infringement. *See* 17 U.S.C. § 117(a). Section 117(a) provides, in relevant part:

> Notwithstanding the provisions of section 106 [which lists the exclusive rights of a copyright holder], it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:
>
>> (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner . . . .

Thus, a defendant seeking protection under § 117(a) must demonstrate that the new adaptation (1) was made by the "owner of a copy of [the] computer

program," (2) was "created as an essential step in the utilization of the computer program in conjunction with a machine," and (3) was "used in no other manner." 17 U.S.C. § 117(a); *see Krause v. Titleserv, Inc.*, 402 F.3d 119, 122 (2d Cir. 2005). We consider each requirement in turn.

### 1. MSEI Is the "owner of a copy of a computer program"

We have held that "owner" as used in § 117(a) does not require formal title in a program copy. *Titleserv*, 402 F.3d at 123. Instead, "courts should inquire into whether the party exercised sufficient incidents of ownership over a copy of the program to be sensibly considered the owner of the copy for purposes of § 117(a)." *Id.* at 124.

In *Titleserv*, we found the following facts sufficient to consider defendant an owner under § 117(a): defendant paid plaintiff "substantial consideration to develop the programs for its sole benefit"; plaintiff "customized the software to serve [defendant's] operations"; plaintiff stored copies "on a server owned by [defendant]"; plaintiff "never reserved the right to repossess the copies used by [defendant] and agreed that [defendant] had the right to continue to possess and use the programs forever, regardless whether its relationship with

22

[defendant] terminated"; and "[defendant] was similarly free to discard or destroy the copies any time it wished." *Id.*

For similar reasons, we conclude as a matter of law that MSEI owned copies of the server software within the meaning of § 117(a). MSEI paid Universal over $1 million for the combined hardware and software solution. Universal customized the software to serve MSEI's precise needs.[3] Universal expressly "provided" a copy of the server software to MSEI with the sole condition that "MSEI assume[d] the risk of invalidating the warranty in the event a change made by MSEI to the source code cause[d] damage to any of the THS line hardware." J. App'x at 2361. Universal granted MSEI and its suppliers broad rights to the server source code -- a perpetual, worldwide license to use, reproduce, and display the software for MSEI's internal use. J. App'x at 2336. Although the terms of the EPA expired on December 31, 2012, MSEI's rights to

---

[3]     Frank Caudrillier, Universal's project manager for the THS, testified that "the THS server was developed based on . . . some common tools that we had . . . developed previously, and then customized . . . to respond to the requirements of [MSEI]." J. App'x at 1511. Kevin Ford, Universal's lead software engineer, testified that the server source code was "created specifically for the THS line" to "implement[] MSEI's requirements." *Id.* at 1668-69. A change order in evidence shows that modifications were made to "THS interface, module information table, reseat and correlate," which Ford testified were modifications to the server source code. *Id.* at 1670-71.

23

the software "continue perpetually and do not terminate upon completion of the services." *Id.* at 2337. Nothing in the arrangement between MSEI and Universal indicates that MSEI was in any way restricted from discarding or disposing of the software as it wished. For all of these reasons, MSEI was an owner of the station and server source code under § 117(a).

Universal contends that MSEI was not an owner because § 8.2(d) "severely limited" MSEI's rights to the software. For support, it cites *DSC Communications Corp. v. Pulse Communications, Inc.*, 170 F.3d 1354 (Fed. Cir. 1999). But as we noted in *Titleserv*, the defendant in *DSC Communications* was expressly prohibited from using the software on hardware other than that provided by plaintiff. 402 F.3d at 123. MSEI faced no such prohibition. In fact, under the EPA, MSEI was authorized to use and reproduce the software at will so long as its uses were "internal."

Universal's argument does find some additional support from the Ninth Circuit, which has held "that a software user is a licensee rather than an owner of a copy where the copyright owner (1) specified that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions." *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111

24

(9th Cir. 2010) (footnote omitted). Although the EPA granted MSEI a license that was limited to MSEI's internal use, it subsequently transferred a copy of the server source code to MSEI with the sole condition that MSEI would be liable for any damage caused by modifications. J. App'x at 2361. Several Universal employees, including its executives, as well as MSEI employees, testified that this provision resolved the issue of "source code ownership." *Id.* at 1048, 1270-71, 1453-54, 1545, 2126-27. In an email to MSEI on October 31, 2008 -- the date of final delivery -- Universal stated internally, "As you can see, we are trying to get away from the Source Code." *Id.* at 2632. It then told MSEI, "we are ready to let you assume ownership of the line." *Id.* at 3009. Thereafter, Universal instructed its team to "get the source code to them today" and to "be sure it is packaged and ready to [sic] (or email it to them or give them the key or whatever)." *Id.* at 2632.

Thus, for the purposes of applying § 117(a), a reasonably jury could only find that MSEI owned a copy of the THS software.

### 2. The Adaptation was "created as an essential step in the utilization of the computer program in conjunction with a machine"

To receive the protection of § 117(a), MSEI must also demonstrate that its modification of the software was "an essential step in the utilization of the computer program[s] in conjunction with a machine." In *Aymes v. Bonelli*, the

25

defendant retail store used programs to track inventory and sales, and generally

organize its records. 47 F.3d 23, 24 (2d Cir. 1995). The defendants modified the

programs to keep them up-to-date and to ensure their compatibility with

successive generations of computer systems. *Id.* at 26. We held that the

modifications were essential to the defendants' utilization of the programs within

the meaning of § 117(a)(1) because the "adaptations were essential to allow use of

the program[s] for the very purpose for which [they were] purchased." *Id.* at 27.

In *Titleserv*, the defendant used the programs at issue "to track and

report on the status of client requests and other aspects of its operations." 402

F.3d at 120. The defendant modified the programs by correcting bugs,

"performing routine tasks necessary to keep the programs up-to-date and to

maintain their usefulness to [defendant]," incorporating the programs into a new

system implemented by defendant, and adding new capabilities to help "make

the programs more responsive to the needs of [defendant's] business." *Id.* at 125.

We reiterated, as we originally held in *Aymes*, that "adaptation of the copy of

the[] software so that it would continue to function on the defendants' new

computer system" constituted an "essential step" within the meaning of § 117(a).

*Id.* at 126. We further held that the "addition of new features," which "were not

26

strictly necessary to keep the programs functioning, but were designed to improve their functionality in serving the business for which they were created," were also "essential." *Id.*; *see also Final Report of the National Commission on New Technological Uses of Copyrighted Works* 13 (1978) [hereinafter "*CONTU Report*"] ("[A] right to make those changes necessary to enable the use for which it was both sold and purchased should be provided. The conversion of a program from one higher-level language to another to facilitate use would fall within this right, as would the right to add features to the program that were not present at the time of rightful acquisition."). In doing so, however, we noted an important limitation: an "essential" improvement ought not to "harm the interests of the copyright proprietor." *Id.* at 129 (citing *CONTU Report* at 13).

As Universal's witnesses testified, the copy of the server software given to MSEI was "pretty much identical" to the copy owned by MSEI. J. App'x at 1724. The modifications that were made were undertaken "to help improve efficiency of the line," *id.* at 1633, and to enable the server software to "support . . . communicating with all of the [new] stations." *Id.* at 1635-38. The modifications were, therefore, "designed to improve [the server source code's]

27

functionality in serving the business for which [it was] created." *Titleserv*, 402 F.3d at 126.

Universal claims that MSEI's provision of the source code to MTA -- "a competitor" of MSEI -- is exactly the sort of harm we indicated in *Titleserv* might present "[a] different scenario." *Id.* We disagree that this is the sort of harm envisioned by § 117(a). By its terms, § 117(a) permits the owner of a copy "to make *or authorize the making* . . . of another adaptation." 17 U.S.C. § 117(a) (emphasis added). And, as we held above, Universal expressly authorized MSEI and its suppliers and subcontractors to use and reproduce the software at issue. True, alterations that "somehow interfere[] with [a copyright owner's] access to, or ability to exploit, the copyrighted work" might render modifications non-essential under § 117(a), but where the copyright owner "enjoy[s] no less opportunity after . . . changes, than before, to use, market, or otherwise reap the fruits of the copyrighted programs that he created," the changes may properly be considered essential under § 117(a). *Titleserv*, 402 F.3d at 129.

MSEI's use did not inhibit Universal's ability to market or sell its server software to others, nor did it divulge sensitive Universal information or enrich MSEI or MTA at the expense of Universal. MSEI made and authorized the

28

making of minor modifications, narrowly tailored to adapting the server software for the use for which it was designed -- orchestration of the test handing stations to ensure the quality of MSEI's implantable medical devices.

Accordingly, we hold that a reasonable jury could only find that the modifications made by MSEI were essential as they allowed the existing server software to interact with additional systems in the manner intended when the source code was developed for MSEI.

### 3. The Adaptation was "used in no other manner"

Finally, to warrant the protection of § 117(a), MSEI must show that the server software was "used in no other manner," that is, it was used only to make an adaptation as an essential step in utilizing the software in conjunction with the test handling system. Universal argues that MSEI's modification of the server software to operate with *new* machines, rather than the *existing* machines created by Universal, defeats MSEI's claim to protection from § 117(a).

"Whether a questioned use is a use *in another manner* . . . depend[s] on the type of use envisioned in the creation of the program." *Titleserv*, 402 F.3d at 129. The server software was designed to be the "brains of the operation," J. App'x at 988, which "synchronize[d] the activities of the hardware and software" and was "responsible for coordinating the movement of the module trays," *id.* at

29

2606. These are precisely the purposes for which MSEI and MTA made modifications, as indicated in the Statement of Work. *See id.* at 2366 ("Update THS Server software to add functionality for the new stations."); *see also id.* at 2367 ("Scope of the project . . . is first to replicate the existing system . . . , and then expand this configuration to add the capability to add three . . . electrical testers . . . , one RF testing stations and one Shaker test station."). There is nothing in the record to suggest that the server source code was used for any purpose other than to adapt the system to handle new testing stations for MSEI's internal use. *See Titleserv*, 402 F.3d at 130 ("What is important is that the transaction for which the programs are used is the type of transaction for which the programs were developed."). Thus, MSEI "simply increased the versatility of the programs by allowing them" to interoperate with new test handling stations, which "constitutes use in the same manner, with the benefit of an adaptation increasing versatility." *Id.*

Moreover, the server software customized by Universal for MSEI was part of the first phase of MSEI's multi-phased test handling system project. Universal was aware that the project had additional phases when it signed the EPA, and at that time it had no guarantees that it would be chosen to supply the

30

later phases.  The addition of new systems was, therefore, a use contemplated at the outset.[4]

For the foregoing reasons, we conclude as a matter of law that it was not an infringement for MSEI as the "owner of a copy of a computer program," or MTA as MSEI's supplier, to "make or have made [an] adaptation," where "such adaptation was created as an essential step in the utilization of the computer program in conjunction with a machine and . . . in no other manner."  17 U.S.C. § 117(a).

## II.  *Breach of Contract*

MSEI and MTA's use and reproduction of Universal's pre-existing intellectual property for use in subsequent phases of the THS was non-infringing because defendants were expressly licensed to do so under § 8.2(d) of the EPA. *See supra* Part I.B.1.  It necessarily follows that MSEI's use and reproduction of the source code was not in breach of the EPA.  *See Davis*, 505 F.3d at 100; *Bourne*, 68 F.3d at 631.  Universal's breach of contract claim is thus reduced to its assertion that MSEI breached the EPA by modifying the server source code.  We do not

---

[4]     We note also that Universal was aware that the project to "replicate the existing system" was awarded to MTA in April 2010, J. App'x at 1014, 2878, and yet it did not object to MTA's provision of subsequent phases of the system, including modifying the server source code, until July 2013 when this action was filed.

reach the merits of this question, however, because what remains of Universal's breach of contract claim is preempted by the Copyright Act.

The Copyright Act exclusively governs a claim when (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106. *Briarpatch L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004). "A state law right is equivalent to one of the exclusive rights of copyright if it may be abridged by an act which, in and of itself, would infringe one of the exclusive rights." *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 430 (2d Cir. 2012) (internal quotation marks omitted). "'But if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action,' there is no preemption." *Id.* (quoting *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992)). Preemption, therefore, turns on "what [the] plaintiff seeks to protect, the theories in which the matter is thought to be protected and

32

the rights sought to be enforced." *Comput. Assocs.*, 982 F.2d at 716 (internal quotation marks omitted).

As we have recognized, "preemption cannot be avoided simply by labeling a claim 'breach of contract.'" *Forest Park*, 683 F.3d at 432; *see also* 5 Nimmer on Copyright § 19D.03[C][2][b] (suggesting that a contract that "does not purport to give [the plaintiff] any protection beyond that provided . . . by copyright law itself" would be preempted). In *Forest Park*, we held the contract at issue not to be preempted because it included an "extra element" of a promise to pay, and plaintiff sought contract damages when defendant used plaintiff's copyrighted work without paying for the privilege. *Forest Park*, 683 F.3d at 428. Here, by contrast, there is no dispute over payment. Universal does not argue that defendants violated the EPA by failing to pay for use of the intellectual property.

What remains of Universal breach of contract claim is that MSEI's modification of the source code exceeded the scope of the license contained in the EPA. This claim does not include an "extra element" that is different from those of its copyright infringement claim. The prohibition against modification is not explicit in the EPA; it is, instead, arguably implied because copyright licenses are

assumed to permit those uses not expressly authorized. *Gilliam*, 538 F.2d at 20.

Universal therefore necessarily seeks to vindicate its exclusive rights under 17

U.S.C. § 106. That Universal and MSEI are in contractual privity does nothing to

change the fact that vindication of an exclusive right under the Copyright Act,

read into a license by negative implication, is preempted by the Copyright Act.

*See* 3 Nimmer § 10.15[A] (noting that "use by the grantee without authority from

the grantor" leads to the legal consequence "that the grantee's conduct may

constitute copyright infringement"). In *Kamakazi Music Corp. v. Robbins Music*

*Corp.*, we held that a licensor's suit against a licensee whose license had expired

was for copyright infringement, not breach of contract. 684 F.2d 228, 230 (2d Cir.

1982). This rationale extends equally to a licensor whose use arguably exceeds

the scope, rather than the duration, of a license. *See Marshall v. New Kids On The*

*Block P'ship*, 780 F. Supp. 1005, 1008-09 (S.D.N.Y. 1991). Because this portion of

Universal's breach of contract claim seeks solely to vindicate an exclusive right

under the Copyright Act, it is preempted. It thus fails as a matter of law because,

as discussed *supra* Part I.B.2, the affirmative defense of § 117(a) bars recovery to

Universal on the theory that MSEI or MTA's modifications to the server source

code infringed Universal's copyright.

## III.    *Misappropriation of Trade Secrets*

A plaintiff claiming misappropriation of a trade secret must prove that (1) "it possessed a trade secret," and (2) the trade secret was used by defendant "in breach of an agreement, confidence, or duty, or as a result of discovery by improper means."  *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990).  We do not reach the merits of this claim, however, because it is time-barred by the applicable statute of limitations.

In New York, a cause of action for the misappropriation of trade secrets is governed by a three-year statute of limitations, while claims for equitable relief are subject to a six-year statute of limitations.  *Compare* N.Y. C.P.L.R. § 214(4) (providing three-year-statute of limitations for claims of misappropriation of trade secrets), *with id.* § 213(1) (providing six-year statute of limitations for claims seeking equitable relief).  Universal argues that its claim for injunctive relief is governed by the more generous six-year limitations period.

"[C]ourts determine the applicable limitations period . . . by analyzing the substantive remedy that the plaintiff seeks."  *ABS Entm't, Inc. v. CBS Corp.*, 163 F. Supp. 3d 103, 108 (S.D.N.Y. 2016) (applying New York law).

"Where the remedy sought is purely monetary in nature, courts construe the suit as alleging 'injury to property' within the meaning of CPLR 214(4), which has a three-year limitations period." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009). In *IDT*, the equitable relief was incidental to the damages sought, so "looking to the reality, rather than the form, of [the] action," the New York State Court of Appeals concluded that IDT principally sought a monetary remedy and, thus, held that the three-year statute of limitations applied. *Id.* at 139-40. Similarly, in this case, the main remedy that Universal seeks is monetary damages. Universal's Third Amended Complaint requested that it be awarded profits and a royalty, not just an injunction, in connection with its misappropriation of trade secrets claim, as well as double damages, punitive damages, and attorneys' fees. Therefore, because the reality of the cause of action is that it is one for damages, not injunctive relief, the three-year statute of limitations applies.

Universal argues that this statute of limitations should be tolled or extended on a continuing tort theory. "A continuing tort theory may apply . . . where the plaintiff alleges that a defendant has kept a secret confidential but continued to use it for commercial advantage." *Andrew Greenberg, Inc. v. Svane,*

36

*Inc.*, 830 N.Y.S.2d 358, 362 (App. Div. 2007). "Where, however, the 'plaintiff had knowledge of the defendant's misappropriation and use of its trade secret, the continuing tort doctrine does not apply.'" *PaySys Int'l, Inc. v. Atos Se*, No. 14-10105, 2016 WL 7116132, at * 9 (S.D.N.Y. Dec. 5, 2016) (quoting *VoiceOne Commc'ns, LLC v. Google Inc.*, No. 12-9433, 2014 WL 10936546, at *10 (S.D.N.Y. Mar. 31, 2014)) (citing cases). Here, Universal had knowledge of MSEI and MTA's alleged misappropriation and use of its trade secret and, accordingly, the continuing tort theory does not apply.

The evidence shows that Universal was put on notice of its misappropriation of trade secrets claim more than three years prior to filing its complaint on July 15, 2013. Accrual of the statute of limitations begins when "a reasonably diligent person in plaintiff's position would have been put on inquiry as to the" claim. *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992). Universal's executive chairman, Jean-Luc Pelissier, testified that in 2009 he understood that there were other companies besides Universal bidding on THS2. He also testified that he understood that when MSEI said it wanted to replicate the THS line, that included the software. On April 16, 2010, MSEI sent an email to Universal informing Universal that MSEI awarded the business for the THS

37

replication project to MTA.  Based on this evidence, a reasonably diligent person would have been put on notice of the misappropriation of trade secrets claim -- that is, that MSEI gave Universal's software and source code to MTA so MTA could replicate and modify it to build the second THS line.  Yet Universal did not assert the claim until more than three years later, in July of 2013.  Thus, Universal's claim is time-barred.

**IV.    *Unfair Competition***

Universal's remaining claim against MTA for unfair competition was also properly dismissed.  "The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another" with "some element of bad faith."  *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980).  MTA was informed prior to executing the MTA Agreement that MSEI and its suppliers were licensed to use and reproduce Universal's source code.  Moreover, Bob Archer, MTA's CEO and co-owner, testified at trial that MTA relied on the language of the EPA in agreeing to supply MSEI with subsequent phases of the THS.

As we have held, the EPA in fact authorized MTA as MSEI's supplier to use and reproduce Universal's pre-existing intellectual property for

38

the THS replication project. *See supra* Part I.B.1. And to the extent MTA adapted the server source code, such adaptions were authorized under federal law. *See supra* Part I.B.2. In these circumstances, no reasonable juror could have found that MTA acted in bad faith in agreeing to replicate the THS line for MSEI's internal use and for no other purpose. *See Jeffrey Milstein, Inc. v. Gregor, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir. 1995). Accordingly, we affirm the district court's dismissal of this claim.

## *CONCLUSION*

Accordingly, for the reasons set forth above, the judgment of the district court is **AFFIRMED**.